SWIFT INDUSTRIES, INC., Appellant
in No. 71–1420,

v.

BOTANY INDUSTRIES, INC., Appellant
in No. 71–1421.

Nos. 71–1420, 71–1421.

United States Court of Appeals,
Third Circuit.

Argued April 6, 1972.

Decided Aug. 14, 1972.

**1126**

Ernest R. Dell, Reed, Smith, Shaw & McClay, James H. McConomy, William S. Lerach, Pittsburgh, Pa., for Swift Industries, Inc.

Judd N. Poffinberger, Jr., Kirkpatrick, Lockhart, Johnson & Hutchinson, Michael C. McLean, Pittsburgh, Pa., Weil, Gotshal & Manges, New York City, for Botany Industries, Inc.

Before ADAMS and GIBBONS, Circuit Judges, and BECKER, District Judge.

## OPINION OF THE COURT

EDWARD R. BECKER, District Judge.

### I

This is a commercial arbitration case. It comes before us on cross appeals from the judgment of the District Court for the Western District of Pennsylvania[1] confirming in part and vacating in part the Award of an arbitrator in a dispute concerning the contractual obligations of Botany Industries, Inc. ("Botany")[2] to Swift Industries, Inc. ("Swift"). The dispute arose out of an Agreement for Exchange of Stock and Plan of Reorganization ("Agreement") dated as of August 10, 1961, among Swift, Botany and the stockholders of Swift pursuant to which, on October 2, 1961, Botany transferred to Swift the shares of two corporations, Allegheny Mortgage Company ("Allegheny") and Lincoln Homes Company ("Lincoln") in exchange for stock in Swift.[3] Prior to the acquisition of Allegheny and Lincoln stock by Botany, Allegheny and Lincoln had been wholly-

---

1. The Opinions of Judge Weber are reported at 325 F.Supp. 577.

2. On April 25, 1972, Botany filed a petition for an arrangement under Chapter XI of the Bankruptcy Act. Receivers have been appointed and the affairs of Botany are presently being conducted under the aegis of the Bankruptcy Court.

Moreover, virtually all of Botany's operating subsidiaries have filed similar Chapter XI petitions.

3. Lincoln is a manufacturer and seller of prefabricated houses. Allegheny finances the purchase of some of the Lincoln houses.

owned subsidiaries of Premier Corporation of America ("Premier"), a subsidiary of Botany.[4] During the period that Allegheny and Lincoln were owned by Premier, they were included in Premier's consolidated federal income tax return.[5]

Among the many provisions of the Agreement were warranties from Botany to Swift to the effect that there were no income taxes due the government from Allegheny and Lincoln such as are the precipitating factor in this litigation. Section 12.02 of the Agreement also contains provisions for payment by Botany to Swift in the event of a breach of that warranty. In pertinent part, § 12.02 provides that should Lincoln, Allegheny, or Swift suffer any loss resulting from liabilities of Lincoln or Allegheny for taxes attributable to ownership of property or operation of their business for any taxable period ended prior to the closing date under the Agreement (other than as provided for in certain schedules appended to the Agreement), Botany is obligated to:

> "pay Swift in cash an amount equal to all losses, liabilities and expenses *incurred or suffered* by Lincoln, Allegheny or Swift . . ."

by reason thereof (emphasis added).

On October 24, 1968, Premier notified Allegheny and Lincoln that the District Director of Internal Revenue in New York City had issued a letter and report (consisting of some 140 pages and 59 schedules) adjusting the income tax liability of Premier and its subsidiaries for the years 1959–62 and determining that there were deficiencies which, with interest to September 15, 1971, totaled some $8,402,670.[6] Premier also advised Lincoln and Allegheny that under the applicable tax regulations, Premier and *each*

of its subsidiaries were jointly and severally liable for the entire consolidated tax liability for each year that they were included in the consolidated return. The potential liability of Allegheny and Lincoln (including interest) for the years 1960 and 1961 was calculated to be $6,033,480. Swift viewed this situation with alarm, since the potential claim exceeded the combined net worth of Allegheny and Lincoln and approximated the consolidated net worth of Swift itself. Prior to the receipt of notification of the Premier tax letter and report, Swift had embarked upon a program of corporate growth through mergers and other transactions, but the balance sheet notation required by its auditors of the possible tax liability impaired its growth program and Swift's ability to borrow.

The claims asserted by the Internal Revenue Service ("IRS") were at once disputed by Premier and Botany. On November 4, 1968, Swift notified Botany that it deemed Botany responsible for taxes or liabilities together with all expenses incurred or suffered by Allegheny, Lincoln, or Swift in connection therewith. However, on December 5, 1968, Botany, through counsel, disclaimed liability. In another development, on November 26, 1968, seven former subsidiaries of Premier (which by this time was insolvent) entered into an agreement to apportion among themselves any ultimate income tax liability and the costs of the tax litigation ("Sharing Agreement"). On February 6, 1970, the District Director in New York issued to Premier a so-called 90-day letter, or statutory notice of deficiency. This notice was contested by Premier and the parties to the Sharing Agreement by appeal to the Tax Court of the United States. The tax litigation is still pending in the Tax Court

---

4. Premier then transferred the stock of Lincoln and Allegheny to Botany pursuant to an intercorporate arrangement.

5. Allegheny was included in the consolidated group for the period July 1, 1960, through December 31, 1961, and Lincoln was included in the consolidated group for the period May 15, 1961, through September 30, 1961.

6. This letter and report is known as a "30 day letter." It was issued on April 4, 1968, and, by its terms, informs the taxpayer that it has 30 days to request further review, in the absence of which the case is processed on the basis of the adjustments shown in the report.

and it is presently uncertain as to how or when it will terminate.

The foregoing recital is obviously the stuff of which lawsuits are made. The lawsuit which emerged was shaped by the Agreement, which had provided that disputes arising therefrom be adjudicated in the forum of commercial arbitration governed by the rules of the American Arbitration Association (AAA). In accordance with those rules, Swift filed a Demand for Arbitration with the AAA. In addition to asking for a declaration that Botany was liable to pay any taxes, penalties, and interest that might be determined to be due at the conclusion of the tax deficiency proceedings, Swift also requested that Botany undertake and pay the cost of defense of the deficiency proceedings. After much preliminary skirmishing,[7] the arbitration finally got underway. Botany zealously argued that it was not responsible for any deficiency. During the course of the arbitration proceedings, Swift advanced the contention that only the delivery by Botany to Swift of a cash or surety bond protecting Swift against the possible tax deficiency would afford complete relief to all parties.[8]

On June 30, 1970, the arbitrator entered his award, which consisted of five lettered paragraphs. The arbitrator's first finding (Paragraph A) was that Botany was liable to Swift for the federal tax deficiencies of Lincoln and Allegheny for the years 1960 and 1961. That finding is no longer a subject of dispute between the parties and the judgment of the District Court confirming it is not before us.[9] Paragraph B of the award provided that Botany should deliver to Swift the sum of $6,000,000 or, in lieu thereof, a surety bond, to protect Allegheny, Lincoln, and Swift against the tax liability as finally determined. Paragraph C required Botany to reimburse Swift in the sum of approximately $100,000 for its counsel fees and expenses to that date. This sum included fees and expenses incurred in connection with both the tax deficiency proceedings and the commercial arbitration proceedings.

The provisions of paragraphs B and C of the Award, providing for payment of $6 million cash or the surety bond and for the payment of all counsel fees, are in bitter dispute and constitute the sinews of this appeal. On January 21, 1971, the District Court, acting on Swift's petition to confirm the Award and Botany's motion to vacate it, entered its judgment in which it confirmed paragraph C (as to fees) but vacated paragraph B in its entirety on the grounds that the award of a bond was improper because: (1) relief was not specifically requested in the prayer of the original arbitration demand; and (2) the Agreement did not specify that a bond could be awarded for a breach of warranty.

7. Botany sued in the Supreme Court of New York in an attempt to enjoin the arbitration proceedings. The case was removed to the District Court for the Southern District of New York. Swift subsequently petitioned the District Court for the Western District of Pennsylvania to compel arbitration under the Federal Arbitration Act, 9 U.S.C. § 4. The Western District ultimately entered an order that the arbitration proceed. Botany thereupon sought a stay of that order. The District Court denied the motion and Botany appealed to this Court, which granted a stay for thirty days pending decision of the Southern District of New York. The Southern District dismissed the action before it because of defective service of process. The appeal to this Court was thereupon dismissed by stipulation.

8. The arbitration proceedings consisted essentially of a pretrial conference, a hearing, and closing arguments. The parties submitted several trial briefs setting forth the facts on which they relied and their legal positions in detail. The arbitration record contains a voluminous amount of factual, financial, legal, and accounting materials.

9. Neither are we concerned with the provisions of paragraphs D and E of the award, which provided that the administrative fee and expenses of the AAA and the arbitrator's fee be divided equally. The judgment of the District Court confirming these provisions is likewise unappealed from.

Swift's motion to amend the Opinion, Order and Judgment was denied.

While we will perforce come to grips with the questions raised by the appeal from the award of counsel fees, the pre-eminent question before us relates to the propriety of the award of the bond, viewed in either of its aspects: (1) as a $6 million cash bond; or (2) as a surety bond. Swift maintains that even though award of a bond was not expressly contemplated in the Agreement, it was authorized by Rule 42 of the Commercial Arbitration Rules which the parties adopted by virtue of the arbitration clause of the Agreement. Rule 42 authorizes the arbitrator to grant "any remedy or relief which he deems just and equitable and within the scope of the agreement of the parties." Botany, on the other hand, argues that the award failed to draw its essence from the Agreement and went beyond the scope of the submission; Botany also contends that the award was completely irrational.

The conflicting contentions of the parties require us to apply to the commercial arbitration field those principles enunciated in a labor arbitration context by the Supreme Court in the case of United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), and by this Court in Ludwig Honold Mfg. Co. v. Fletcher, 405 F.2d 1123 (3d Cir. 1969). Although we decide the case on a different basis than the District Court, we affirm.[10]

## II

We turn first to an exegesis of *Enterprise* and *Honold* and of the general principles of law governing the matter before us. *Enterprise* is the leading Supreme Court case enunciating the general principles that govern the disputes as to the authority of the arbitrator to fashion relief, which is the threshold question in this case. Although *Enterprise* is a labor arbitration case, its principles have been generally applied to the commercial arbitration field as well, keynoted by the oft quoted words of Mr. Justice Douglas, who delivered the Opinion of the Court:

"When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order

---

10. Judge Weber held that the arbitrator could not grant relief in the form of a bond because that relief was not specifically requested in the prayer for relief in the demand for arbitration. The request for a bond as a form of relief was, however, submitted by Swift in its pretrial memorandum and fully argued and briefed by both parties. Federal courts have recognized that one of the primary virtues of the arbitration is its procedural informality. In the leading case of American Almond Prod. Co. v. Consolidated Pecan S. Co., 144 F.2d 448 (2d Cir. 1944), Judge Learned Hand approved an award which granted a monetary award, although the demand for arbitration asked only for declaratory relief, noting that:

"Arbitration may or may not be a desirable substitute for trial in courts; as to that the parties must decide in each instance. But when they have adopted it, they must be content with its informalities; they must not hedge it about with those procedural limitations which it is precisely its purpose to avoid. . . ." 144 F.2d at 451.

We do not construe the rules of arbitration so narrowly as to foreclose the arbitrator from granting relief requested by the parties after the filing of the demand. Cf. Rule 54(c) of the Federal Rules, which states:

"[E]very final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings."

*See also* 6 Moore's Federal Practice, 1209–11 (2d ed.1968); Kahan v. Rosenstiel, 424 F.2d 161, 174 (3d Cir. 1970), cert. denied, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970). Hence, our affirmance of Judge Weber's decision is not on the ground that the failure to request a bond in the prayer for relief forecloses its award.

In a similar vein, we do not credit the position of Swift that, because Botany did not, before the arbitrator, question that the award of a bond was within his power, it has waived all objections to the bond.

to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency. Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, *yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement.* When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." (emphasis added.)

In the *Honold* case, which followed in the wake of *Enterprise,* resolution of the issues made it necessary for this Court to elucidate upon the general principles announced in *Enterprise,* and thus to define still more sharply the general principles governing the scope of federal judicial review of an arbitrator's award. Judge Aldisert did so, *inter alia,* in the following terms:

"[A] labor arbitrator's award does 'draw its essence from the collective bargaining agreement' if the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention; only where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop, may a reviewing court disturb the award." [11]

*Honold* was, like *Enterprise,* a labor arbitration case; however, in his discussion of the scope of federal judicial review of an arbitrator's award, Judge Aldisert did not limit himself to labor arbitration cases, drawing upon precedent in the commercial arbitration field as well:

"Although we are quick to recognize that cases involving commercial arbitration disputes under the Federal Arbitration Act are not controlling authority, an examination of standards applied by reviewing courts is invited."

He then went on to recite principles of review concededly applicable in commercial arbitration cases:

"[I]t has been held that a 'mere error in the law or failure on the part of the arbitrators to understand or apply the law' will not justify judicial intervention, and that the courts' function in confirming or vacating a commercial award is 'severely limited' . . . ;"

and:

"[T]he interpretation of . . . arbitrators must not be disturbed as long as they are not in 'manifest disregard' of the law. [Wilko v. Swan, 346 U.S. 427, 436, 74 S.Ct. 182, 98 L.Ed. 168]."

■ A careful reading of *Honold* indicates that the principles governing labor and commercial arbitration cases are similar, and we therefore consider the principles of *Honold* with respect to the authority of the arbitrator to fashion an award and the scope of judicial review to be applicable in commercial arbitration cases as well. However, even though the principles are similar, there are differences in the rigor of judicial review, depending upon whether we are dealing with a labor or commercial arbitration case.

In United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 578, 80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409 (1960), the Court explained the different policy considerations applicable to commercial and labor arbitration cases:

"In the commercial case, arbitration is the substitute for litigation. Here

---

11. These principles are consistent with the provisions of the Federal Arbitration Act, 9 U.S.C. § 10(d), which permits a court to vacate an award when the arbitrators have "exceeded their powers."

arbitration is the substitute for industrial strike. Since arbitration of labor disputes has quite different functions from arbitration under an ordinary commercial agreement, the hostility evinced by courts toward arbitration of commercial agreements has no place here. For arbitration of labor disputes under collective bargaining agreements is part and parcel of the collective bargaining process itself."

And in *Honold,* Judge Aldisert observed:

"Our reference to the area of commercial arbitration has been deliberate, even though we recognize that identical considerations do not apply to the labor field. To the extent that these cases reflect the judicial attitude toward the concept of arbitration, however, they are singularly important in determining the correct standard for the judicial review of labor awards. We are aware of the strong public policy of encouraging the peaceful settlement of industrial disputes by means of the device of arbitration. We are also aware of what has been called the 'hostility evinced by courts toward arbitration of commercial agreements.'

Bearing this in mind and perceiving that the Supreme Court's announced standards in reviewing commercial awards call for the exercise of judicial restraint, we must conclude that such a philosophy of restricted review compels even less judicial interference in *matters arising from labor arbitration.*

. . ."

We note too that the role of arbitration in our national labor policy has become even more firmly entrenched since *Honold* was announced. *See* Boys Markets, Inc. v. Retail Clerk's Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

■ The facts of this case require that we highlight one additional principle of review that emanates from *Honold.* For, in holding that an arbitrator's award does not draw its essence from the agreement if the arbitrator's interpretation cannot be rationally derived therefrom, *Honold* has, in addition to limiting the arbitrator's authority to fashion relief, also established that an award may not stand if it does not meet the test of fundamental rationality. The New York Court of Appeals, whose opinions are the source of much instruction in this field, has held that an award of an arbitrator is not subject to judicial revision unless it is "completely irrational," Lentine v. Fundaro, 29 N.Y.2d 382, 328 N.Y.S.2d 418, 278 N.E.2d 633 (1972). We consider this formulation to be a fair rendering of *Honold.* In any event, it is an accurate statement of the law.

■ At this juncture, we must turn to the application of the principles of *Honold* to the facts at bar, keeping in mind that while our scope of review is limited, it is not as limited as in a labor arbitration case. We will first examine the question of the authority of the arbitrator to award a cash or surety bond as a form of relief, then the question of the inherent rationality or irrationality of the terms of the award, and finally, the appropriateness of the award of counsel fees.

### III

■ As we have already noted, the threshold question in the case is the extent of the arbitrator's authority to fashion relief. It is, of course, fundamental that the authority of the arbitrator springs from the agreement to arbitrate. The arbitration clause in the Agreement in question (§ 14.08) is the standard AAA arbitration clause:

"Section 14.08. *Arbitration.* Any controversy or dispute arising under this Agreement shall be settled by arbitration in accordance with the rules of the American Arbitration Association. . . ."

This clause in turn invokes § 42 of the AAA rules which provides:

"SCOPE OF AWARD—The Arbitrator may grant any remedy or re-

lief which he deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract. . . . "

In our preliminary statement, we summarized the provisions of the Agreement providing for Botany's obligations to Swift in the event it owes federal taxes or has certain liabilities or commits breaches of covenant. Neither in those provisions nor elsewhere in the Agreement is there mention of a bond as a form of remedy in the event of breach. It is apparent that the parties never contemplated a bond as the means of making an aggrieved party whole. Swift, nonetheless, submits that, far from limiting the power of the arbitrator to consider the question of a bond, the adoption in the Agreement of the AAA rules, thereby invoking Rule 42, constitutes an articulation of the power of the arbitrator to award "any remedy or relief" including a bond. Swift also notes that § 14.04 of the Agreement provides:

> "It is not intended that the rights of Swift under . . . § 12.02 . . . shall be its exclusive remedy for the breach of any . . . warranties,"

and argues that the presence of this section reinforces a conclusion as to the efficacy of Rule 42 in this case. At this juncture, reversing the coin, as it were, Swift adds that, in any event, the Agreement contains no provision *excluding* the consideration of the bond from arbitration and that, since the AAA clause is a so-called "broad" arbitration clause under the umbrella of which every controversy or dispute is included unless, by express language, the particular dispute is excluded, *see* Boston & Maine Corp. v. Illinois Central RR, 396 F.2d 425 (2d Cir. 1968), the arbitrator's award of the bond was proper.

Needless to reiterate, Botany dissents from these propositions; hence it is nec-essary to discuss those aspects of the Agreement which shed light on the question of the authority of the arbitrator to award a bond. Before doing so, it is important to place the nature of the arbitrator's award in perspective. In our view, the arbitrator's alternative award is tantamount to a $6 million cash bond. At oral argument, Swift placed heavy accent on that portion of the arbitrator's award that provided for the posting of a surety bond in lieu of cash, intimating that a bond premium (of approximately $17,800 per year) was the full extent of Botany's liability. However, under interrogation by the Court, Swift conceded that surety companies do not idly issue six million dollar bonds upon the mere payment of premium, but indeed require in addition a demonstration of immaculate credit standing or else the encumbering of viable assets (perhaps to the extent of $6 million). At that juncture in the case it was apparent that the award was in fact tantamount to a $6 million cash bond. Although it does not influence our decision, Botany's recently acquired status as a Chapter XI debtor (see n. 2) underscores this conclusion.

The Agreement provides that, in the event of a breach of warranty, Botany will pay to Swift in cash an amount equal to "all losses, liabilities and expenses *incurred or suffered* by Lincoln, Allegheny or Swift by reason of any of the events specified. . . . " (emphasis added). Botany asserts that no party, including Lincoln, Allegheny, or Swift, has yet, within the meaning of the Agreement, incurred or suffered any liability, expense, or loss as the result of the asserted tax deficiencies. We agree. The pending tax claim is clearly not an expense or loss. The question then is whether it is a liability in the legal sense. Within the 90-day period following issuance of the Statutory Notice of Deficiency,[12] the matter was appealed to the Tax Court, where it now resides as

---

12. The Statutory Notice of Deficiency is authorized by 26 U.S.C. § 6212.

an open matter to be determined by that court. The Statutory Notice of Deficiency does not constitute an assessment of liability; it constitutes the assertion of the government's claim. While responsible auditors may deem it necessary to *note* the issuance of the Statutory Notice on a financial statement, what they do is to note it, not list it as a legal liability, which it is not. This conclusion is unaltered by the fact that the Commissioner's determination is considered to be presumptively correct,[13] for the burden of proof is still upon the government. *See* Psaty v. United States, 442 F.2d 1154 (3d Cir. 1971).[14]

Swift and Botany have always concurred that the Agreement conferred upon the arbitrator the power to *declare* whether or not Botany might be liable to Swift for any tax deficiency with which Lincoln and Allegheny might ultimately be charged. What Botany has questioned is whether there may be drawn from the Agreement the authority to award what is tantamount to a six million dollar cash bond to cover a liability which has not only not yet been "incurred or suffered," but which may or may not ever accrue (or which may accrue only in part). Botany points to the absence from the Agreement of any provisions which would secure either party against breaches of warranty by the other.[15] Such provisions are frequent in agreements of this type, and we cannot assume that their absence was accidental. Botany contends that the absence of security provisions means that the parties were relying on each other's general credit with respect to repairing any breach, and certainly we cannot gainsay that this is so.

We have sought to distill from the Agreement the essence of the arbitrator's authority. Whatever that authority may be, it is clear to us that it does *not* include the authority to award a six million dollar cash bond to cover a liability which contrary to the requirements of the applicable breach of warranty clause, has not yet been (and may not be) "incurred or suffered," in a situation where the parties did not provide for such security in their agreement, although they might have done so.[16] In our view, to award, as an adjunct to declaratory relief, a form of prejudgment execution which the Agreement by its lack of reference to security seems to exclude rather than to intend, is to eclipse the framework of the agreement and to venture onto unprotected ground. We subscribe to the observations of the *Enterprise* court that the draftsmen may be unable to perceive in advance what specific remedy should be awarded to meet a particular contingency and that in arbitration flexibility is important. But the principle of flexi-

13. See Pearce v. Commissioner of Internal Revenue, 315 U.S. 543, 546, 62 S.Ct. 754, 86 L.Ed. 1016 (1962) ; Old Mission Portland Cement Co. v. Helvering, 293 U.S. 289, 294, 55 S.Ct. 158, 79 L.Ed. 367 (1934).

14. Swift points out that under certain circumstances, *see* 26 U.S.C. § 6861, a jeopardy assessment can be made subjecting a taxpayer's assets to seizure prior to final determination of the tax claim. Whatever significance a jeopardy assessment might have in another situation, it has no relevance here because no jeopardy assessment has ever been sought by the government. Hence, jeopardy assessment considerations are beside the point.

15. The breach of warranty clauses are "mirror image" clauses and inure to the benefit of both Swift and Botany.

16. We note that §§ 12.02(a) and (e) of the Agreement dealing with Botany's responsibilities to Swift for losses resulting from "liabilities" of Lincoln and Allegheny respectively (in contradistinction to "taxes," "breaches of covenant," and "expenses in respect to liability" mentioned in sub-clauses (b), (c), (d), (f), (g), and (h) of § 12.02) encompass liabilities "whether or not accrued and whether or not determined or determinable." The meaning of that clause is not certain, and at the least, it is subsidiary to the concluding paragraph of § 12.02 limiting Botany's obligations to losses "incurred or suffered." In any event, that clause does not refer to tax claims and is not apposite here.

bility of relief cannot be permitted to obscure or to effect a metamorphosis of the claim itself. That untoward event would occur if we were to permit the arbitrator's award to stand in this case. *Cf.* Truck Drivers and Helpers Local 784 v. Ulry-Talbert Company, 330 F.2d 562 (8th Cir. 1964).

■ Having reviewed the Agreement in the light of its language, its context, and the parties' apparent intent, and in terms of the question of the arbitrator's authority to fashion relief, we conclude that the arbitrator's award of a six million dollar cash surety bond does not draw its essence therefrom and that it is in manifest disregard thereof and must be set aside.

### IV

Assuming, arguendo, that the arbitrator had authority to award a bond, Botany nonetheless attacks the award on a second basis: that its terms are completely irrational. We approach this allegation cautiously, for, although the complete irrationality of an award is a basis for setting it aside, the irrationality principle must be applied with a view to the narrow scope of review in arbitration cases. The basis of Botany's "irrationality" attack is the Sharing Agreement.

The Sharing Agreement was executed by the then solvent former subsidiaries of Premier after receipt of the 30 day letter. Its purpose was to provide for the orderly prosecution of the Premier tax controversy, to arrange in advance a fair allocation of and a fund for defraying its costs, and to determine in advance a fair allocation of the deficiencies finally determined to be due. In schedule B attached to the agreement, the respective deficiency shares for the years in question were set forth.

■ As noted above, Lincoln and Allegheny were included in the Premier consolidated return in 1960 and 1961.

The schedule B provision for those years is as follows:

| Member | Deficiency 1960 | Share 1961 |
|---|---|---|
| E. C. Publications, Inc. and E. C. Creations, Inc.* | 32.555% | 37.686% |
| Airco Supply Company, Incorporated | 21.087% | 10.001% |
| Lincoln Homes Company | None | 33.444% |
| Allegheny Mortgage Corporation | 9.676% | None |
| Horsman Dolls, Inc. | None | 13.007% |
| Globe Products Corporation | 36.682% | 5.862% |

\* Affiliated corporations treated as a single Member for computation purposes.

The tax deficiency asserted by the government was $1,019,619.60 for the year 1960 and $2,783,698.17 for the year 1961. Thus, under the sharing agreement, the maximum tax liability of Lincoln and Allegheny exclusive of interest would be $98,658.04 for 1960 and $930,979.65 for 1961 for a total of $1,029,637.69. With interest, the maximum tax liability of Lincoln and Allegheny would be approximately $1.5 million, and then only if Premier were unsuccessful in *all* of its contentions before the Tax Court. Can a $6 million cash bond award be deemed rational in view of a maximum $1.5 million liability under the Sharing Agreement? We think not.

Swift argues in reply that it is conceivable that Lincoln and Allegheny might be responsible for the full amount of the liability—if all of the other subsidiaries became insolvent. In this regard, however, we note the uncontroverted affidavit filed with the District Court by Edward C. Wallace, a member of the New York law firm of Weil, Gotshal and Manges, general counsel to Botany. In the affidavit, Mr. Wallace sets forth that E. C. Publications Inc. and E. C. Creations Inc., two parties to the sharing agreement, are subsidiaries of Kinney National Services Inc. ("Kinney"), and that subsequent to the signing of the Sharing Agreement, Kinney had guaranteed in writing the obligations of its two subsidiaries under the sharing agreement. We take judicial notice of the fact that, prior to its acquisition by

Warner Communications Inc.,[17] whose shares are traded on the New York Stock Exchange, Kinney's shares were, in their own right, traded on that exchange. The E.C.—Kinney obligation is far more substantial than the Lincoln-Allegheny share —totaling some 32.5% of the 1960 deficiency and 37.68% of any 1961 deficiency. The fact of the Kinney guarantee strongly militates against Swift's rejoinder that it is conceivable Lincoln and Allegheny might have to bear the full $6 million liability despite the Sharing Agreement. And while, in the absence of record facts, we cannot and do not make a definitive finding of Kinney's financial strength, it was certainly capricious for the arbitrator to fail to investigate and consider the Kinney financial situation before making a six million dollar award.

We therefore hold that there is a second ground supporting Judge Weber's action in setting aside paragraph B of the Award—its complete lack of rationality.

## V

In his paragraph C, the arbitrator awarded to Swift the sum of $100,492.36 to reimburse it for attorneys' fees and costs which it had actually expended in connection with both the tax deficiency proceedings and the arbitration proceedings. Botany does not dispute that award insofar as it relates to sums expended by Swift in connection with the tax deficiency proceedings; it does however vigorously contest the award insofar as it orders Botany to pay Swift's fees for the arbitration proceedings. We must therefore apply the principles which we have set forth above, and determine whether the award of Swift's counsel fees for the arbitration proceedings may be drawn from the essence of the Agreement.

The award of fees has its basis in §§ 12.02(d) and (h) of the Agreement, which provide for payment in cash by Botany to Swift if "Lincoln or Swift shall incur any expense in respect of any liability" described, inter alia, in § 12.02 (b) or (p) (the tax provisions of the Agreement). Before determining independently whether the arbitrator's award of counsel fees for the arbitration itself draws its essence from the Agreement,[18] we must first consider whether that award is tainted by the same defects which invalidated the award of the bond.

Sections 12.02(d) and (h) with which we are here concerned are operative only with respect to expenses "incurred or suffered." Inasmuch as we have found that the tax deficiency has not yet become a liability and that it has not yet been incurred or suffered, does not the claim for counsel fees in the arbitration proceeding run afoul of the same problem as Swift's breach of warranty tax deficiency claim? We think not. First of all, in contrast to the tax deficiency claim, the obligation of Swift to its attorneys for counsel fees in the arbitration proceeding has been "incurred or suffered"—in fact, it has been paid. But there is another vital factor which serves to distinguish the counsel fee claim; it relates to the question of what event(s) need occur before the right to reimbursement for counsel fees accrues.

The arbitrator found that the Agreement comprehends reimbursement for counsel fees incurred in connection with the arbitration proceedings. The purpose of the arbitration proceedings was to determine whether or not Botany was liable to Swift for such deficiency as might ultimately be assessed against Premier for which Lincoln and Allegheny might be held liable under the Sharing Agreement. In this regard, it is important to note that, although in this Opinion we have not (because of the lack of

---

17. Warner Communications is a conglomerate named for the Warner Bros. Theatre interests which organized it.

18. We note that the AAA rules do not deal with counsel fees at all.

an appeal on the point) dealt with paragraph A of the arbitrator's award which constituted a declaration that Botany was liable to Swift for any tax deficiency ultimately determined to be due, that issue was hotly contested before the arbitrator. Botany asserted (unsuccessfully) a host of arguments with which it sought to persuade the arbitrator that the Agreement did not impose liability upon Botany regardless of whether the tax deficiencies assessed against Lincoln and Allegheny should ultimately be sustained. Against this background, it seems reasonable to construe the Agreement to mean that when Swift's counsel achieved a declaration from the arbitrator (which is final by reason of nonreview) to the effect that Botany was ultimately liable to Swift for the deficiency (in whatever sum it might be finally determined), there was nothing more that could or need be done in this regard and the right to reimbursement for counsel fees had thereupon accrued.

■ Having determined that the claim for counsel fees may be viewed in a different light from the tax deficiency claim, we turn to the question of whether the arbitrator's counsel fee award draws its essence from the Agreement on the one hand, or whether it is in manifest disregard thereof, on the other. On this point we agree with Judge Weber who confirmed the counsel fee award. Judge Weber found that what was involved in the fee award was a matter of contract construction well within the authority of the arbitrator. *See* Bernhardt v. Polygraphic Co., 350 U.S. 198, 203, 76 S.Ct. 273, 100 L.Ed. 199 (1956). In view of the analysis which we have applied to distinguish the counsel fee situation from the tax situation, we cannot conclude that the fee award was in disregard of the Agreement. Hence, it may not be disturbed by this court.

The judgment of the District Court will be affirmed.

* Rule 18, 5 Cir., Isbell Enterprises, Inc. v. Citizens Casualty Company of New