617 P.2d 861

**In the Matter of the Arbitration between**
**HECLA MINING COMPANY,**
Claimant–Respondent,

v.

**The BUNKER HILL COMPANY,**
Respondent–Appellant.

No. 13044.

Supreme Court of Idaho.

Oct. 8, 1980.

William F. Boyd, of Brown, Peacock, Keane & Boyd, Kellogg, for respondent–appellant.

Michael B. White, Wallace, and Lawrence R. Small, of Paine, Lowe, Coffin, Herman & O'Kelley, Spokane, Wash., for claimant–respondent.

McFADDEN, Justice.

The Bunker Hill Company (Bunker Hill) appeals the decision of the district court

which refused to vacate or partially modify, and instead confirmed an arbitrator's award of $423,503.70 to Hecla Mining Company (Hecla). We affirm the district court's actions.

The Star Mine and the Morning Mine are located on adjacent property near Burke, Idaho. Until late 1961, the Star was owned by Bunker Hill and the Morning by Hecla. These two mines were "unitized" by agreement (the 1961 unitization agreement) in order to facilitate development of their potential. The mines were thereafter known as the Star–Morning Unit Area. Hecla was named operator of the Unit Area and the ore concentrate produced, in line with the conveyance of interest in the 1961 unitization agreement, belonged 70% to Bunker Hill and 30% to Hecla.

In 1966 Hecla agreed to sell all of its 30% share of the ore from the Unit Area to Bunker Hill for smelting, and Bunker Hill agreed to purchase that ore (this arrangement continuing a purchasing pattern begun in 1962). It was also determined by the two companies that further "deep mining" development of the Unit Area would be economically practicable. Bunker Hill and Hecla entered into a formal agreement (the 1966 smelting agreement) embodying both the purchase of ore and the further development of the Unit Area.

That portion of the 1966 smelting agreement involved here concerning the smelting and purchase of the concentrates provided that it was to:

"[R]emain in force and effect for a period of five years, and for consecutive five year periods thereafter unless either party, not less than six months prior to the termination date of any five year period, serves written notice requesting a joint contract review for the purpose of making adjustments which might then be required to render the terms herein again comparable with competitive schedules prevailing in the trade for the purchase of like materials and which adjustments shall be made for succeeding five year periods."

This agreement was to take effect when the deep mining of the Unit Area commenced, which occurred on June 26, 1970. Some four and one-half years later, Bunker Hill requested joint contract review pursuant to the above quoted language. After some negotiation, Bunker Hill submitted a proposed schedule in May, 1975.

In order to satisfy itself that the May proposal was "comparable with competitive schedules prevailing in the trade," Hecla demanded the right to inspect various documents in the possession of Bunker Hill, including its smelting contracts with other companies. Bunker Hill refused and after a period of negotiation, the parties reached an impasse.

The parties failed to reach a satisfactory compromise before the expiration date of the original five year term of the 1966 smelting agreement (June 26, 1975). Bunker Hill soon thereafter (July 21, 1975) made a second proposed price adjustment. While Hecla did not agree with this proposal either, Bunker Hill imposed it in making scheduled payments for the ore from the Unit Area as of July 21.

Another section of the 1966 smelting agreement provided that the parties would be bound by an arbitration provision set forth in the 1961 unitization agreement for the settlement of any unresolved differences which stated:

"(i) If any disagreement shall at any time or times arise between the parties hereto with respect to any matter or thing whatsoever covered by or pertaining to this agreement such disagreement shall be settled and disposed of if possible by an exchange of letters between the parties hereto, but if such disagreement cannot be so settled and disposed of, then and in such event the same shall be submitted to and determined and settled by arbitration conducted by and under the rules of the American Arbitration Association. There shall be one arbitrator. All information which shall be requested in consideration of such disagreement shall be promptly furnished by the party or parties in possession thereof and the deci-

sion in writing of such arbitrator shall be final. Any and all charges with respect to the cost of arbitration shall be borne thirty per cent (30%) by Hecla and seventy per cent (70%) by Bunker."

Pursuant to these provisions, Hecla demanded arbitration, filing a formal demand on August 13, 1975. In that document, Hecla stated the "nature of the dispute" as:

"Determination of a fair and equitable adjustment in the net price for the purchase by the Bunker Hill Company of Hecla Mining Company's share of the lead and zinc concentrates produced at the jointly–owned Star mine in north Idaho under the agreements between the parties dated December 13, 1961, January 22, 1962, and May 20, 1966 and the obligations of the parties arising thereunder."

The parties entered into a stipulation in February, 1976, prior to the arbitration hearings which stated in pertinent part:

"1. The parties agree to arbitrate *all issues in dispute arising out of or in connection with that certain Agreement dated the 20th of May, 1966* [the 1966 smelting agreement], by and between The Bunker Hill Company, Buyer, and Hecla Mining Company, Seller, by the terms of which the Seller undertook to sell and the Buyer undertook to buy the Claimant Hecla's 30% portions of the lead and zinc concentrates produced under the Star/Morning Unit Area Agreement [1961 unitization agreement]. The *nature of one of said disputes is as defined in the Demand for Arbitration* dated August 13, 1975, on file herein." (Emphasis supplied).

The arbitrator thereafter entered a "Pre–Hearing Order" which defined the scope of the controversy by setting forth the admitted facts and the contentions of the parties. This order was prefaced:

"The parties to the above arbitration proceeding, through their respective counsel, have agreed upon the terms of a pre–hearing order and, as a result, this pre–hearing order has been formulated and settled as follows . . . ."

In this order, Hecla contended that Bunker Hill did not participate in the joint contract review in good faith as it was required to do by the fiduciary relationship existing between the parties. Hecla further alleged that the terms of the 1966 smelting agreement continued in force because of this failure. Bunker Hill countered *inter alia* that the 1966 smelting agreement was terminated as of June 26, 1975, because notice requesting contract review had been given, and also because there was no provision within the 1966 agreement covering price schedules absent an agreement reached after contract review.

The arbitrator also set forth in this document the parties' characterizations of "issues of fact and law" for the arbitrator's decision. These included whether Bunker Hill could put the new terms (i. e., the July 21 proposal) into effect over Hecla's protest that contractual and fiduciary obligations hadn't been met; whether there existed any such fiduciary obligations; and whether or not the 1966 smelting agreement terminated on June 26, 1975. It should be noted that the contentions of the parties paralleled each other and neither side contested the scope of issues being raised.

In preliminary holdings, the arbitrator determined that arbitration was mandatory; that the 1961 unitization agreement created a joint venture between Bunker Hill and Hecla; that the 1962 arrangement for purchase of the concentrates, formalized in the 1966 smelting agreement, made the parties a captive buyer and seller; that as a result of the joint venture and captive purchase arrangements, the parties had a fiduciary relationship which required them, *inter alia*, to participate in the joint contract review in good faith; and that this fiduciary duty required Bunker Hill to reveal in a timely manner certain financial information to Hecla to enable it to satisfy itself that the terms offered by Bunker Hill fell within the parameters of the 1966 smelting agreement. These conclusions are not contested on appeal.

After hearing the matter, the arbitrator issued "findings of fact and conclu-

sions of law."[1]  In essence, he found that the proposal of July 21, 1975, made by Bunker Hill and thereafter utilized in making payments to Hecla was, in fact, "competitive" within the terms of the 1966 agreement.  But he also found that Bunker Hill initially failed to undertake joint contract review in a timely manner and in good faith, and further, that the company did not provide all of the information to Hecla required by the fiduciary stance of the parties until the end of December, 1975.  Concluding that Bunker Hill would be justified in utilizing the proposed price schedule only when the other contractual obligations under the 1966 agreement were satisfied, the arbitrator deemed the proposal of July 21, 1975 to be in effect as of January 1, 1976.[2] As a result, Bunker Hill owed Hecla $423,503.70 plus interest.  This sum was the difference between the payments made under the July 21, 1975 schedule unilaterally imposed by Bunker Hill and those payments that would have been made under the former schedule had it continued in effect until Bunker Hill met the contractual/fiduciary obligations and Hecla could have satisfied itself that the proposal was competitive.

Bunker Hill filed a motion to vacate or partially modify the award under I.C. §§ 7–912 and 913, and Hecla filed an application for confirmation of the award under 9 U.S.C. § 9 [or I.C. § 7–912(d) in the alternative].  The grounds urged by Bunker Hill in support of their motion are encompassed within those set forth on appeal and will be considered below.  The district court denied Bunker Hill's motion and confirmed the award.

■ At the outset, we note that federal law concerning the review of arbitrator's awards applies since the underlying factual situation here clearly concerns interstate commerce.  9 U.S.C. § 1.  *See, Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 401–2 (n.7),87 S.Ct. 1801, 1805, 18 L.Ed.2d 1270, 1276 (1967); *Pinkis v. Network Cinema Corp.*, 9 Wash.App. 337, 512 P.2d 751, 754–5 (1973); *Pathman Const. Co. v. Knox County Hospital Ass'n*, 326 N.E.2d 844, 848–51 (Ind.App.1975); *Allison v. Medicab Int'l Inc.*, 92 Wash.2d 199, 597 P.2d 380, 381–3 (1979); *Dean Witter Reynolds, Inc. v. Roven*, 94 N.M. 273, 609 P.2d 720, 722 (1980).  Therefore, we utilize the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and the cases thereunder instead of Idaho's enactment of the Uniform Arbitration Act, I.C. § 7–901 et seq.[3]

■ Our holding in this case must necessarily be premised upon a clear understanding of the role the judiciary is to play in reviewing the decisions reached by arbitrators selected by the parties to resolve disputes between them.  The recognition in *Western Const., Inc. v. Oregon–Southern Idaho and Wyoming Dist. Council of Labor-*

1. Although the arbitrator so characterized his decision, this is not required.  Indeed the arbitrator need not set forth the reasons for his award at all.  *See United Steelworkers of America v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 598, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424, 1428 (1960); *Bernhardt v. Polygraphic Co. of America*, 350 U.S. 198, 203, 76 S.Ct. 273, 276, 100 L.Ed. 199, 205–6 (1956); *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 244, 82 S.Ct. 1318, 1322, 8 L.Ed.2d 462, 468 (1962); Domke on Commercial Arbitration § 29.06.

2. The arbitrator's decision actually stated January 1, *1977*.  However, the district court found this to be a typographical error and the parties do not dispute this finding.

3. Bunker Hill originally urged application of the Uniform Arbitration Act in the district court;

on appeal it at times argues in the alternative. Moreover, appellant argues non–statutory grounds such as "manifest disregard" that are purely federal in both origin and application while it contends that the Federal Arbitration Act is inapplicable.  Aware of possible confusion, we note that our view of the proper scope of judicial review of commercial arbitrator's awards does not vary significantly depending upon which act applies.  As the district court noted, insofar as the present controversy is concerned the language of the two acts is "so similar as to constitute a distinction without a difference."  It should also be noted that because of the determination by this court that the federal act applies due to the interstate nature of the subject matter, a number of appellant's arguments directly focusing upon the Idaho act need not be decided at this time.

*ers and Laborers Local Union 267*, 101 Idaho 145, 147, 609 P.2d 1136, 1138 (1980), that the scope of such review is "limited" inaugurates our present analysis.[4]

The essential nature of arbitration is that the parties, by consensual agreement, have decided to substitute the final and binding judgment of an impartial entity conversant with the business world for the judgment of the courts. They seek to avoid the cost, in both time and money, of formal judicial dispute resolution. But when the parties bargain for the binding decision of an arbitrator, they necessarily accept the fact that his interpretation of the facts, the law, and the equities of the situation may not be entirely satisfactory to them. As Learned Hand once stated in approving an arbitrator's money award where only declaratory relief was sought:

> "Arbitration may or may not be a desirable substitute for trial in courts; as to that the parties must decide in each instance. But when they have adopted it, they must be content with its informalities; they may not hedge it about with those procedural limitations which it is precisely its purpose to avoid. They must content themselves with looser approximations to the enforcement of their rights than those that the law accords them, when they resort to its machinery." *American Almond Products Co. v. Consolidated Pecan Sales Co.*, 144 F.2d 448, 451 (2d Cir. 1944).

The Supreme Court similarly noted in *Wilko v. Swan*, 346 U.S. 427, 438, 74 S.Ct. 182, 188, 98 L.Ed. 168, 177 (1953):

> "Congress [by enacting the Federal Arbitration Act] has afforded participants in transactions subject to its legislative power an opportunity generally to secure prompt, economical and adequate solution of controversies through arbitration if the parties are willing to accept less certainty of legally correct adjustment."

This was the opportunity seized by the parties here.

■ It must be remembered that the right to litigate disputes in court is generally available but that it can be contractually relinquished. *United Steelworkers of America v. Warrior and Gulf Nav. Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409, 1417 (1960); *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 241, 82 S.Ct. 1318, 1320–1, 8 L.Ed.2d 462, 466 (1962). We must assume that large, industrial corporations such as the parties here were aware of the tradeoffs inherent in the use of arbitrators as the alternative means of handling commercial disputes, and contracted accordingly. See, *e. g.*, Nicely, Resolution of Impasses in Joint Mining Operations, 22 Rocky Mountain Mineral Law Institute 307, 324–30 (1976).

■ The attitude evidenced by the above cited cases is manifested by the rule that courts will not review arguable "errors" of an arbitrator, that is, the decision is not subject to the same appellate scrutiny as a decision of a court of law. We agree with the statement of the Supreme Court in *United Steelworkers of America v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424, 1429 (1960).

> "It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his."

This expression by the Supreme Court has been seen as essentially foreclosing judicial review of the merits of arbitration awards. As later stated in *Hines v. Anchor Motor*

---

4. We recognize that Western Construction is concerned with *labor* arbitration and as appellant points out and as is manifest in that decision, the scope of judicial review varies from that for *commercial* awards. We need merely add here that review in both areas is grounded upon similar considerations of judicial policy, and therefore *Western Construction* and other "labor" cases are persuasive though not exactly identical. See, e. g., *Swift Industries, Inc. v. Botany Industries, Inc.*, 466 F.2d 1125, 1129–31 (3d Cir. 1972); *Ludwig Honold Manufacturing Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir. 1969). The "persuasiveness" is evidenced by the authority cited in both case law and in the parties' briefs herein.

*Freight, Inc.*, 424 U.S. 554, 563, 96 S.Ct. 1048, 1055, 47 L.Ed.2d 231, 240 (1976):

> "[Courts] should not undertake to review the merits of arbitration awards but should defer to the tribunal chosen by the parties finally to settle their disputes. Otherwise, 'plenary review by a court of the merits would make meaningless the provisions that the arbitrator's decision is final, for in reality it would almost never be final. [citing *Enterprise, supra*].'"

As early as 1855, this belief in the propriety of judicial restraint led to the statement of a rule of review.

> "Arbitrators are the judges chosen by the parties to decide the matters submitted to them, finally and without appeal. As a mode of settling disputes it should receive every encouragement from courts of equity. *If the award is within the submission, and contains the honest decision of the arbitrators, after a full and fair hearing of the parties, a court of equity will not set it aside for error either in law or fact.* A contrary course would be a substitution of the judgment of the Chancellor in place of the judges chosen by the parties, and would make an award the commencement, not the end, of litigation." (Emphasis added.) *Burchell v. Marsh*, 17 How. 344, 349, 58 U.S. 344, 349, 15 L.Ed. 96, 99 (1855).

With the exception of certain non–statutory "additions" to the power of the courts to vacate or modify arbitrator's awards (considered *infra*), the limiting rule of Burchell remains valid. See, e. g., *Wilko v. Swan, supra* ; *Bernhardt v. Polygraphic Co.*, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956); *San Martine Compania de Navegacion v. Saguenay Terminals Ltd.*, 293 F.2d 796, 800–1 (9th Cir. 1961); *Lundgren v. Freeman*, 307 F.2d 104, 110 (9th Cir. 1962). See also, 20 A.L.R. Fed. 295; 6 C.J.S. Arbitration § 162.

As more recently stated:

> "The courts are precluded from considering factual or legal issues which are by voluntary agreement made the subject of arbitration. Judicial intrusion is restricted to extraordinary situations indicating abuse of arbitral power or exercise of power beyond the jurisdiction of the arbitrator." *Mobil Oil Corp. v. Local 8–766, Oil, Chemical and Atomic Workers Int'l*, 600 F.2d 322, 326 (1st Cir. 1979) (citing *Local Union 251, Int'l Brotherhood of Teamsters v. Narragansett Improvement Co.*, 503 F.2d 312 (1st Cir. 1974)).

These "extraordinary situations" are precisely those encompassed by 9 U.S.C. §§ 10 and 11.[5] In light of the well accepted limits on the power of this court to review alleged

---

5.  9 U.S.C. § 10.

"In either of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

(a) Where the award was procured by corruption, fraud, or undue means.

(b) Where there was evident partiality or corruption in the arbitrators, or either of them.

(c) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

(d) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

(e) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators."

(See also I.C. § 7–912)

9 U.S.C. § 11.

"In either of the following cases the United States court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration—

(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.

(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.

(c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties."

(See also I.C. § 7–913).

arbitral "errors," we turn first to the statutory grounds for vacation and modification raised by the appellant.

■ Appellant contends that the decision of the arbitrator violated the express grounds for vacation found in § 10(d) (exceeding powers) and for modification in § 11(b) (awarding on a matter not submitted). Both of these contentions are based on the factual argument that the question of *when* the adjusted price schedule would take effect was never presented to the arbitrator. We disagree.

The "contentions" and proposed "issues of fact and law" of the parties in the pre-hearing order, and the stipulation of the parties, both set forth *supra*, clearly indicate that *all* issues in dispute arising out of or in connection with the 1961 and 1966 agreements were submitted. The stipulation further notes that "one" of the issues was the competitiveness of the proposed schedule; it manifestly was not, as is now argued by Bunker Hill, the sole issue. Hecla expressly set forth the issue "[w]as the Bunker Hill Company entitled to put the new terms into effect in July, 1975, over the protest of Hecla, and without fulfilling its contractual and fiduciary obligations under the 1966 smelter agreement, including a bona fide joint contract review?" Bunker Hill's own statement of issues in the pre-hearing order placed the termination of the 1966 agreement schedule and the existence of any fiduciary relationship–the fundamental basis of the arbitrator's award–into dispute. This court cannot engage in an artificially narrow reading of the "submission" especially when to do so negates the very purpose of submitting disputes to arbitral resolution. We find no reason to disturb the arbitrator's award on this ground.

■ The conclusion that the question was "submitted," also aids in our analysis of the allegation that the arbitrator exceeded his powers. It is beyond cavil that arbitrator's powers stem from the agreement of the parties. *United Steelworkers of America v. Enterprise Wheel and Car Corp., supra* ; *Swift Industries Inc. v. Botany Industries, Inc.,* 466 F.2d 1125, 1131 (3d Cir.

1972); *Lundgren v. Freeman, supra* 307 F.2d at 109–10. See also, *H. S. Cramer and Co. v. Washburn–Wilson Seed Co.,* 68 Idaho 416, 420–1, 195 P.2d 346, 349 (1948); *Western Const., Inc. v. Oregon–Southern Idaho and Wyoming Dist. Council of Laborers and Laborers Local Union 267,* 101 Idaho 145, 609 P.2d 1136 (1980). The matters submitted for arbitration by the parties are relevant in determining the scope of the grant of power, and must be considered along with the original agreement to arbitrate. Absent express limitation by the parties, the resulting grant of authority is very broad. This includes the ability to frame relief and is reflected in the rules of the American Arbitration Association, which state in part:

"SCOPE OF AWARD–The Arbitrator may grant any remedy or relief which the Arbitrator deems just and equitable and within the scope of the agreement of the parties . . . ."

See *Swift Industries Inc. v. Botany Industries, supra* at 1131–2. As noted the parties here clothed the arbitrator with authority to decide "all issues in dispute arising out of or in connection with" the 1966 smelting agreement, and further outlined those disputes by their contentions and proposed issues of fact and law, all of which were submitted to the arbitrator for resolution. We find nothing in the record or in appellant's arguments to lead us to the conclusion that the arbitrator overstepped the bounds of his conferred powers in considering or awarding upon issues of fiduciary obligation, good faith contract review, termination or existence of the 1966 smelting agreement price schedule, the "competitiveness" of the July 21, 1975 proposal, or the effective date of the new price schedule.

Bunker Hill alleges two additional grounds for overturning the award: that it was in "manifest disregard" of the law, and that it was "completely irrational." It was once generally accepted, consonant with the expressions of proper judicial review, *supra*, that the grounds set forth by statute were exclusive. See, e. g., *Wilko v. Swan, supra,* 346 U.S. at 436, 74 S.Ct. at 187, 98 L.Ed. at

176; *San Martine Compania de Navegacion v. Saguenay Terminals Ltd., supra*, 293 F.2d at 800–1; 6 C.J.S. Arbitration § 162; Domke on Commercial Arbitration § 33.02. However, it was stated in *Wilko*:

"In unrestricted submissions . . . the interpretations of the law by the arbitrators *in contrast to manifest disregard* are not subject, in the federal courts, to judicial review for error in interpretation." (Emphasis added.) *Wilco v. Swan, supra* 346 U.S. at 436–7, 74 S.Ct. at 187–8, 98 L.Ed. at 176.

Later, in *Enterprise*, Justice Douglas elaborated:

"[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. *When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.*" (Emphasis added.) *United Steelworkers of America v. Enterprise Wheel and Car Corp.*, 363 U.S. at 597, 80 S.Ct. at 1361, 4 L.Ed.2d at 1428.

This led a number of federal courts to create an additional means of judicial review. ▪ As interpreted by the 9th Circuit in the leading case of *San Martine, supra*, this non–statutory ground of "manifest disregard" or "infidelity" being referred to

"must be something beyond and different from a mere error in the law or failure on the part of the arbitrator to understand or apply the law.

.     .     .     .     .

We apprehend that a manifest disregard of the law in the context of the language used in *Wilko v. Swan, supra*, might be present when the arbitrators understand and correctly state the law, but proceed to disregard the same." 293 F.2d at 801.

Similarly, concerning this "disregard," the 9th circuit has stated:

"[If] it is possible for an honest intellect to interpret the words of the contract and reach the result which the arbitrator reached . . . we do not believe it to be our function to inquire further." *San Francisco–Oakland Newspaper Guild v. Tribune Publishing Co.*, 407 F.2d 1327, 1328 (9th Cir. 1969),

and

"[I]f, on its face, the award represents a plausible interpretation of the contract in the context of the parties' conduct, judicial inquiry ceases and the award must be affirmed." *Holly Sugar Corp. v. Distillery, Rectifying, Wine and Allied Workers Int'l Union, AFL–CIO*, 412 F.2d 899, 903 (9th Cir. 1969).

In contrast, as stated by Circuit Judge J. Blaine Anderson,

"The violation of an express and explicit restriction on the arbitrator's power cannot be a plausible interpretation." *Federated Employers of Nevada, Inc. v. Teamsters Local No. 631*, 600 F.2d 1263, 1265 (9th Cir. 1979).

Manifest disregard, then, seems necessarily tied into the knowing or unexplainable abuse by the arbitrator of his position of responsibility and his authority as granted and limited by the agreement of the parties.

▪ Essentially, Bunker Hill's argument is that the arbitrator awarded "damages" to Hecla where none were pled or proved, and that by doing so, he "manifestly disregarded" the law and the award is, consequently, "irrational." This argument is based upon the theory that since the arbitrator found that the July 21 proposal was "competitive" within the terms of the 1966 smelting agreement, Hecla would never have been entitled to a greater price for the ore and thus suffered no injury from Bunker Hill's payments pursuant to the proposal. As appellant states in its brief,

"[t]hus, the arbitrator made a determination . . . that Hecla was not damaged through Bunker Hill's actions but . . . [awarded] Hecla substantial damages."

This argument misconceives both the nature of the arbitrator's award and the rule of *San Martine*.

The arbitrator specifically found that Bunker Hill breached the contract by not initially acting in a timely manner and by not taking part in joint contract review in good faith, but *not* by failing to make a "competitive" adjustment. While in breach, Bunker Hill unilaterally imposed the otherwise valid proposed price schedule. In his interpretation of the contract, the arbitrator found that the proposed schedule could not be in effect while Bunker Hill had not met its contractual and fiduciary obligations.

Not only are we precluded from substituting our interpretation of the submitted contract for that of the arbitrator, *supra*; we cannot utilize the ground of "manifest disregard" in this situation. As *San Martine, supra,* 293 F.2d at 801, makes clear, this non-statutory ground is not an excuse for the court to weigh the "degree of error" of law, if any, and thereby thwart the rule of limited review. Rather, the arbitrator must have manifested an infidelity to his obligation to honestly interpret the contract within the context of the issues submitted to him. This the arbitrator here did not do. Were we empowered to analyze the award for errors of law, it might well be impossible to find any error where the arbitrator found a breach, an injury proximately caused thereby, and awarded a sum to place the parties in the position they would have found themselves had the contract been properly performed. Certainly, any arguable problem in this award rests in the forum of "errors of law or fact" or "interpretation of the contract," and not that of "manifest disregard of the law" or "manifest infideli-

ty" to the arbitrator's obligation. In light of the standards set forth by the 9th Circuit, *supra*, we find no such disregard or infidelity in the arbitrator's actions or award in this case.

The other non-statutory argument made in this vein by Bunker Hill is that the award lacks an essential "rationality." This ground stems from roots similar to manifest disregard, though it appears to be less widely accepted. See, e. g., *Swift Industries, Inc. v. Botany Industries, Inc., supra* 466 F.2d at 1131; *I/S Stavborg v. Nat'l Metal Converters, Inc.,* 500 F.2d 424, 429–31 (2d Cir. 1974) (award "clearly erroneous both in logic and result" but "not irrationally so.") The previously quoted portions of *San Francisco–Oakland Newspaper Guild* and *Holly Sugar* provide ample means for gauging rationality. In light of our previous discussion it is clear that the award here was objective and reasoned, as well as within the arbitrator's power, and will withstand an attack that it is "irrational."

We have examined the other errors alleged by the appellant, Bunker Hill, and find them unpersuasive. The district court's confirmation of the award and denial of the motion to vacate or modify is affirmed. Costs to respondent.

DONALDSON, C. J., and SHEPARD, BAKES and BISTLINE, JJ., concur.