433 So.2d 1158 (1983)
Ex parte ALABAMA OXYGEN COMPANY, INC., and the Industrial Development Board of the City of Bessemer.
(In re ALABAMA OXYGEN COMPANY, INC., and the Industrial Development Board of the City of Bessemer, Alabama v. YORK INTERNATIONAL, YORK DIVISION, BORG-WARNER CORPORATION, et al.)
82-106.
Supreme Court of Alabama.
May 13, 1983.
*1159 Robert D. Hunter of Lange, Simpson, Robinson & Somerville, Birmingham, for appellants.
E.L. Brobston of Brobston & Brobston, Bessemer, and A.H. Gaede, Jr. and M.W. Goodwyn, Jr. for Bradley, Arant, Rose & White, Birmingham, for appellees.
PER CURIAM.

I.
This court must determine whether the writ of mandamus should issue and the trial court be directed to vacate its stay entered in the civil action below.
*1160 Petitioners are the Industrial Development Board of the City of Bessemer, Alabama, herein the "Development Board," and Alabama Oxygen Company, Inc., herein "Alabama Oxygen." Respondent is York International, herein "York."

II.
The Development Board agreed with Lotepro Corporation, a non-party (herein "Lotepro") for the construction of an air separation facility in Bessemer, Alabama. It was to be built on property owned by the Board. The completed facility was to be leased to Alabama Oxygen. Lotepro served as general contractor for the construction project and also served as purchasing agent for the Board.
One component incorporated by Lotepro into the air separation facility was a refrigeration package obtained from York. The subcontract for this component was negotiated and executed by Lotepro and York. It involved an oral agreement followed by a written confirmation. There is conflicting evidence whether arbitration was discussed, but the written confirmation of Lotepro's oral purchase order contained a clause calling for arbitration. It read as follows:
"Any dispute, controversy or claim arising out of or related to this contract shall be settled by arbitration held in New York City in accordance with the rules then and there pertaining to the American Arbitration Association, and judgment upon any award rendered in such proceeding may be entered in any court having jurisdiction as provided by law."
The contract further provided that it should be "construed and governed by and according to the laws of the State of New York." Both the Board and Alabama Oxygen contend they were unaware of the terms of the subcontract.
The refrigeration package was brought from York, Pennsylvania (through Maryland, Virginia, Tennessee and Georgia) to Bessemer, Alabama, where it was assembled, tested, and placed into operation by representatives of Lotepro and York. It was then tendered to petitioners for acceptance.
On several occasions failure of the equipment caused shutdowns to the entire separation facility. The refrigeration package was ultimately removed and replaced.
On 9 November 1981, York filed a motion to stay pending arbitration. The parties submitted briefs on the issues presented by York's motion. On 21 June 1982, the trial court entered an order granting York's motion and staying proceedings pending arbitration. The trial court's findings were that:
(1) The Federal Arbitration Act (herein the "F.A.A." or the "Act") applies to any contract which arises from a transaction involving interstate commerce. The transaction in question arose from such a transaction.
(2) Lotepro was the agent of the Development Board. Under Alabama law of agency, the Board is bound by the contract executed between Lotepro and York.
(3) Alabama Oxygen has brought suit as a third party beneficiary of the contract executed between Lotepro and York. Under Alabama contract law, Alabama Oxygen is bound by the arbitration agreement in that contract.
(4) Even if state law rather than federal law governs the issues raised by York's motion, then the law of the State of New Yorknot Alabamaapplies. Under the law of New York, agreements to arbitrate such as the one entered into by the Lotepro and York are clearly enforceable.
The Development Board and Alabama Oxygen filed a motion for reconsideration, which was overruled. This petition for the writ of mandamus followed.

III.
Petitioners seek the writ ordering the trial court to vacate its stay and allow prosecution of their civil action against York. The dispositive issue presented for decision by this court is whether the trial court erred in choosing to apply federal *1161 rather than state law and, in the alternative, New York rather than Alabama law.
Alabama Oxygen and the Development Board contend Alabama law controls the issues presented by this case. We agree.

IV.
The United States Supreme Court has not directly confronted the issue whether the F.A.A. is to be applied in state courts. Many states have so held.[1] See Moses H. Cone Hospital v. Mercury Constr. Corp., ___ U.S. ___, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). That court has, however, stated in dicta that "state courts, as well as federal courts are obligated to grant stays under § 3 of the Arbitration Act." Id., at ___, 103 S.Ct. at 942.
A review of the Act and its legislative history leads us to the conclusion that we would be remiss in interpreting it as applicable in Alabama. We believe the Supreme Court, upon full consideration of the issues, would not so hold. Further, we are of the opinion the Act, if construed as applicable to the states, presents serious constitutional questions.

A.
Our first inquiry is whether Congress, pursuant to its power to regulate commerce, U.S. Const., Art. 1, § 8, has prohibited state regulation of the aspect of commerce involved here. Where, as here, the field which Congress is said to have preempted has been traditionally occupied by the States, see, e.g., U.S. Const., Art. 1, § 10; Patapsco Guano Co. v. North Carolina, 171 U.S. 345, 358, 18 S.Ct. 862, 867, 43 L.Ed. 191 (1898), the assumption is that the historic police powers of the States are "not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). This assumption provides assurance that "the federal-state balance," United States v. Bass, 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971), will not be disturbed unintentionally by Congress or unnecessarily by the courts. Only when Congress has "unmistakably ... ordained," Florida Lime & Avocado Growers, Inc., v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), that its enactments alone are to regulate a part of commerce, must state laws regulating that aspect of commerce fall. Congress's command may be either expressly stated in the statute's language, or implicitly communicated in its structure and purpose. City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 633, 93 S.Ct. 1854, 1859, 36 L.Ed.2d 547 (1973).
Congress passed the F.A.A. in 1925 pursuant to its power to regulate procedure in the federal courts and control interstate commerce. H.R.Rep. No. 96, 68th Cong. 1st *1162 Sess. 1 (1924). Its purpose was to enforce arbitration agreements in federal courts.
Notably, the Act was debated prior to the Supreme Court's decision in Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). At that time the federal courts had interpreted Swift v. Tyson, 41 U.S. 1, 16 Pet. 1, 10 L.Ed. 865 (1842), to mean they could adopt a federal common law in diversity cases that differed from the state common law of the forum. The wording of the Act and its legislative history indicate a desire by Congress to create a law only applicable in federal courts in diversity cases.
The body of the F.A.A. makes evident the intent of the framers that the Act not preempt state law regarding arbitration. Section 3 of the Act provides for the stay of proceedings pending arbitration brought in "any of the courts of the United States", 9 U.S.C. § 3, upon any issue referable to arbitration under an agreement in writing for such arbitration. Section 4 provides for an order compelling arbitration only when the federal district court would have jurisdiction over a suit on the underlying dispute. 9 U.S.C. § 4.
Had the framers of the Act intended that it be applicable in state courts surely they would have given those courts the power to compel arbitration. In a case where "the party opposing arbitration is the one from whom payment or performance is sought, a stay of litigation alone is not enough. It leaves the recalcitrant party free to sit and do nothingneither to litigate nor to arbitrate." Moses H. Cone Hospital v. Mercury Constr. Corp., supra. We envision a situation where, while the contract is one which arises from an interstate transaction, there is no diversity jurisdiction. Where, as in Alabama, the arbitration of future disputes is against public policy, so that no state statute provides a court with the power to compel arbitration, and the parties cannot obtain a § 4 order from a federal court because of lack of diversity jurisdiction, the party who wishes to compel arbitration would have no way to do so.
Furthermore, there is no clause within the Act specifically preempting state law. While it is not necessary that Congress specify when an act preempts state law, it has been done, as in 17 U.S.C. § 301, entitled "Preemption with Respect to Other Laws." In any event, the Congress did not specify preemption in the Federal Arbitration Act.
Neither does the legislative history of the Act indicate intent to do so. Testimony at the Joint Hearings on the bill indicates Congress intended to create a law applicable only in federal courts:
"Nor can it be said that the Congress of the United States, directing its own courts ..., would infringe upon the provinces or prerogatives of the States. The question of the enforcement relates to the law or remedies and not to substantive law. The rule must be changed for the jurisdiction in which the agreement is sought to be enforced.... There is no disposition therefore by means of the Federal bludgeon to force an individual State into an unwilling submission to arbitration enforcement." Joint Hearings on S. 1005 and H.R. 646 before the Subcommittees of the Committees on the Judiciary, 68th Cong., 1st Sess., 739-40 (1923). (Statement of Mr. Julius Henry Cohen, draftsman for the American Bar Association of the proposed bill.)
See Prima Paint Corp. v. Flood & Conklin Manufacturing Co., 388 U.S. 395, 408-11, 87 S.Ct. 1801, 1808-1810, 18 L.Ed.2d 1270 (1967) (Black, J., dissenting), where Justice Black discusses the legislative history of the F.A.A.
We cannot, in light of the substance of the Act and its legislative history, conclude that Congress has, either explicitly or implicitly, ordained that the Federal Act preempt state law.

B.
Had the F.A.A. ordained that state law was to be preempted by that Act, we would be compelled to consider its constitutionality in light of the Commerce Clause and the Tenth Amendment. "It has long *1163 been established that the commerce power does not reach activity which merely `affects' interstate commerce. There must instead be a showing that the regulated activity has a substantial effect on that commerce." Hodel v. Virginia Surface Mining and Reclamation Ass'n, Inc. 452 U.S. 264, 312, 101 S.Ct. 2352, 2392, 69 L.Ed.2d 1 (1981) (Rehnquist, J., concurring). See NLRB v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893 (1937); Shreveport Rate Case, 234 U.S. 342, 351, 34 S.Ct. 833, 836, 58 L.Ed. 1341 (1914); Wickard v. Filburn, 317 U.S. 111, 125, 63 S.Ct. 82, 89, 87 L.Ed. 122 (1942); North American Co. v. SEC, 327 U.S. 686, 705, 66 S.Ct. 785, 796, 90 L.Ed. 945 (1946). In Maryland v. Wirtz, 392 U.S. 183, 197, n. 27, 88 S.Ct. 2017, 2024, n. 27, 20 L.Ed.2d 1020 (1968), overruled on other grounds, 426 U.S. 833, 852-855, 96 S.Ct. 2465, 2474-2476, 49 L.Ed.2d 245 (1976), the Supreme Court stated it had not declared Congress may use a "relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities."
We have found no studies regarding the effects upon interstate commerce of various state provisions regarding arbitration. Most of the states enforce agreements to arbitrate future disputes. Alabama encourages arbitration by statutorily providing that an arbitrator's decision has the same effect as a state court jury verdict, § 6-6-12, Code 1975, but does not allow specific enforcement of agreements to arbitrate future disputes. § 8-1-41, Code 1975. We do not think variance in state policies regarding arbitration has more than a trivial impact on interstate commerce.

C.
Even if Congress had the power to regulate under the Commerce Clause, such regulation would, under the circumstances here presented, constitute a violation of state rights pursuant to the Tenth Amendment.
It is well settled that Congress's authority under the Commerce Clause is restricted by the protections afforded the states by the Tenth Amendment. See, e.g. National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976); Hodel v. Virginia Surface Mining & Reclamation Association, Inc., 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); United Transportation Union v. Long Island R.R. 455 U.S. 678, 102 S.Ct. 1349, 71 L.Ed.2d 547 (1982). In National League of Cities v. Usery, the Supreme Court struck down an attempt by Congress to extend the wage and hour provisions of the Fair Labor Standards Act to state and local governments. The Tenth Amendment was there defined as an "affirmative limitation on the exercise of [congressional power under the Commerce Clause] akin to other commerce power affirmative limitations contained in the Constitution." 426 U.S. at 841, 96 S.Ct. at 2469.
The Supreme Court established a standard for determining whether a Congressional regulation is violative of the Tenth Amendment in Hodel v. Virginia Surface Mining & Reclamation Ass'n., Inc.:
"[I]n order to succeed, a claim that congressional commerce power legislation is invalid under the reasoning of National League of Cities must satisfy each of three requirements. First, there must be a showing that the challenged statute regulates the `States as States.' Second, the federal regulation must address matters that are indisputably `attributes of state sovereignty.' And third, it must be apparent that the States' compliance with the federal law would directly impair their ability `to structure integral operations in areas of traditional governmental functions.'"
452 U.S. at 287-288, 101 S.Ct. at 2365-2366 (citations omitted; emphasis in original).
Moreover,
"Demonstrating that these three requirements are met does not ... guarantee that a Tenth Amendment challenge to congressional commerce power action will succeed. There are situations in which the nature of the federal interest advanced may be such that it justifies state submission."
*1164 Id., at 288, n. 29, 101 S.Ct. at 2366, n. 29 (citations omitted).
The F.A.A., if interpreted as applicable in Alabama, would undoubtedly regulate Alabama as a State. In Hodel, the Supreme Court, in determining whether a federal act regulated "States as States," considered whether the States were compelled to enforce the standards provided by the Act, to expend any state funds, or to participate in the federal regulatory program in any manner whatsoever. Id. 452 U.S. at 276, 101 S.Ct. at 2360.
If required to enforce the F.A.A., because the Act provides no federal question jurisdiction, Alabama would be compelled to enforce the Act in state courts. In so doing, we would be required to violate longstanding state public policy. Our policy regarding agreements to arbitrate future disputes was recently expressed in Wells v. Mobile County Board of Realtors, 387 So.2d 140, 144 (Ala.1980):
"As long ago as 1840, Bozeman v. Gilbert, 1 Ala. 90 (1840), the court noted that an individual has a right to have his rights determined in a court of law. The court stated:
"`A mere agreement to decide a controversy by arbitration cannot be enforced at law, or in equity, because no one can effectually waive his right to have his suits determined at the proper Courts provided by the laws of his country.' (Emphasis added.) 1 Ala. at 91.
"The public policy of this state is to encourage arbitration and amicable settlements of differences between parties. As the Court stated in Headley, v. Aetna Ins. Co., 202 Ala. [384], 385, 80 So. 466 (1918):
"`A covenant in a contract, whether of insurance or of other matters, to submit every matter of dispute between the parties, growing out of such contract, to arbitration or to a board of appraisers, to the end of defeating the jurisdiction of courts as to be subjectmatter, are [sic] universally held to be void, as against public policy. There need be no such express intent to so defeat the jurisdiction; if the necessary effect of the covenant will inevitably so operate, it is held to be void because against public policy. * * * The policy of this state favors arbitration and amicable settlements of differences between parties; but it does not favor or allow agreements in advance to oust or defeat the jurisdiction of all courts, as to all differences between parties. Const., § 84; §§ 2908-2923.'
"`A general provision in a contract for the arbitration of any dispute which may arise thereunder does not oust the courts, nor bar a suit either at law or equity. Stone v. Dennis, 3 Port. 231; Kinney v. Baltimore & Ohio Employes' Ass'n, 35 W.Va. 385, 14 S.E. 8, 15 L.R.A. 142. (Emphasis added.)'"
Furthermore, our courts would, if forced to apply the F.A.A., be compelled to violate a provision of Alabama's Constitution and an act of our Legislature. Our constitution provides:
"That all courts shall be open; and that every person, for any injury done him, in his lands, goods, person, or reputation shall have a remedy by due process of law; ...."
Section 13, Const. of Ala. of 1901.
Our Legislature has provided:
"The following obligations cannot be specifically enforced:
". . .
"(3) An agreement to submit a controversy to arbitration."
§ 8-1-41, Code 1975.
We can envision no more compelling a situation where a State is regulated as a State than where it is compelled to violate the State's Constitution, to act contrary to the wishes of the citizens as expressed through its Legislature and to reverse its Legislature's enactment.
The second requirement is that the federal statute address an "undoubted attribute of state sovereignty." A contract to arbitrate a dispute is within the realm of contract law. Contract reparations have always *1165 been considered matters within the constitutional framework of state courts. Most of the law regarding the enforcement of contracts has been developed by the common law. Regulation of this aspect of contract formation by Congress thwarts the development of the common law of contracts by the various states.
That the specific area of contract law regulated by the F.A.A. is one which is an "undoubted attribute of state sovereignty" is evidenced by the fact that every state in the union has enacted legislation regarding the enforceability of agreements to arbitrate.[2]
The third prong of the National League of Cities test is the requirement that the federal intrusion must impair the ability of the state to structure integral operations. Were Alabama to be required to enforce the F.A.A. it would necessitate alteration of a body of case law which has developed from over a hundred years of judicial thought and experience, and development of a new body of case law. The application of the Federal Act in Alabama would disrupt commercial relationships. There would be unsettled areas of law controlling the enforcement of an arbitration agreement under the Act. These unsettled areas would be a source of uncertainty for parties wishing to make an arbitration contract.
Because we are satisfied that the F.A.A. runs afoul of all three prongs of the National League of Cities test, we turn to the balancing test; whether "the federal interest advanced [is] such that it justifies state submission." Hodel, 452 U.S. at 288, n. 29, 101 S.Ct. at 2366, n. 29, citing Fry v. United States, 421 U.S. 542, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975). We opine that in this case, the federal interests in imposing the F.A.A. on states is weak, while both state and federal interests in applying independent state law is strong.
Many courts, to be sure, have discerned "a strong federal policy" in favor of commercial arbitration over litigation in federal courts. In Moses H. Cone Hospital v. Mercury Constr. Corp., supra, the Supreme Court stated:
"Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act. In Prima Paint Corp. v. Flood & Conklin Mfg. Corp., 388 U.S. 395 [87 S.Ct. 1801, 18 L.Ed.2d 1270] (1967), for example, the parties had signed a contract *1166 containing an arbitration clause, but one party alleged that there had been fraud in the inducement of the entire contract (although the alleged fraud did not go to the arbitration clause in particular). The issue before us was whether the issue of fraud in the inducement was itself an arbitrable controversy. We held that the language and policies of the Act required the conclusion that the fraud issue was arbitrable, Id., at 402-404 [87 S.Ct. at 1805-1806]. Although our holding in Prima Paint extended only to the specific issue presented, the courts of appeals have since consistently concluded that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration. We agree. The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." (Emphasis added.)
We would make two points. First, there seems to have been no consideration whether there is a strong federal interest in favor of commercial arbitration over litigation in state courts. (It must be noted that in Moses H. Cone the source-of-law factor had very little significance.) Secondly, we conclude that both the state and federal interest in preserving state contract law in this area outweighs federal interest in favor of arbitration.
The cases relied on in support of the theory that there is a federal interest in arbitration reveal no such policy in favor of arbitration in state courts. The court in Robert Lawrence Co. v. Devonshire Fabrics, Inc., 271 F.2d 402, 410 (2nd Cir.1959), cert. dismissed, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960), first announced the federal policy favoring arbitration. This policy, the court said, arises "to help ease the current congestion of court calendars."[3] It does not follow that where there is a federal policy in favor of easing the congestion of court calendars in federal courts, that such a policy would extend to state courts.
We believe it is in the federal interest for state rather than federal law to control the enforcement of arbitration agreements in state courts. The laws of contracts, torts, and property have always been considered matters within the constitutional framework of state courts. These areas of the law have, in the main, been developed through the common law.
While there has been a national surge toward uniformity in the law, pluralism, rather than uniformity, is the genius of the developing common law among our states. Pluralism in the law has permitted each state to find the best solutions to its own problems. Pluralism is the means by which each state may profit from the experience and activities of all the rest. It is in the best interest of both federal and state government to avoid forcing states into a national mold that takes no account of local needs and conditions. We think that is the *1167 antithesis of what the authors of our Constitution contemplated for our federal system.
For instance, oil and gas law has been carefully developed and is generally well settled in all of the oil and gas producing states. Theories of mineral ownership, however, vary from state to state. Implied covenants in oil and gas leases, correlative rights of owners, and the nature of ownership of both fugacious and hard minerals varies among these mineral producing states. In the name of uniformity and under its commerce powers, a Congress could invade this state function; but would it be in the national interest?
Congress could regulate regarding tort reparations. It could, in the name of uniformity, wipe out the law of negligence, products liability, state procedures, rules of evidence, presumptions, and defenses which in the various states have developed case by case after much thought. Would it be in our best interests for Congress to provide uniform, but inflexible, tort legislation? We think that sort of uniformity would lead to mediocrity in the law.
Furthermore, if Congress preempts the states in the areas of contracts, torts, and property, what is left for the states? The imposition of uniform acts in these areas is an intrusion upon the integrity of state judiciaries and upon the states themselves. This sort of preemption is exactly what the Tenth Amendment to the Constitution was intended to prevent.

V.
The trial court held that even if state law governed the issues raised by York's motion for a stay pending arbitration, then the law of the State of New York, rather than Alabama, would apply. That court stated:
"The contract between the Bessemer IDB and York provides in the most unambiguous terms that the contract between these parties `shall be construed and governed by and according to the laws of the State of New York.' Clauses such as this stipulating that the laws of another state will govern in the case of any dispute under the contract are enforceable in Alabama." Blalock v. Perfect Subscription Company, 458 F.Supp. 123 (S.D.Ala.1978); aff'd, 599 F.2d 743 (1979).
The trial court was apparently misled as to the federal district court's holding in Blalock. The latter court did state: "Under Alabama law, it is entirely proper for parties to stipulate that their contract will be governed by the laws of such a foreign state. See Craig v. Bemis Company, Inc., 517 F.2d 677, 680 (5th Cir.1975)." In Craig, the Fifth Circuit Court of Appeals held that under Alabama law, where a contract made and performed in Alabama provided that the terms of the contract should be governed by the law of Minnesota and there was no conflict between that law and Alabama law or public policy, the law of Minnesota should apply. It stated:
"Alabama recognizes the right of the contracting parties to choose the law of another state to govern their contractual rights and duties, so long as the consequences of such a provision are not likely to be contrary to Alabama law or public policy. Connell v. United States Steel Corp., 516 F.2d 401, 407 (5th Cir.1975); Matthews v. Swift & Co., 465 F.2d 814, 818 (5th Cir.1972); J.R. Watkins Co. v. Hill, 214 Ala. 507, 508, 108 So. 244, 245 (1926)."
517 F.2d at 680.
New York law should not have been applied when that law conflicts with the public policy of Alabama. The clause in the contract regarding applicability of New York law cannot override the public policy considerations of the law of Alabama. Petitioners cite Southern Express Co. v. Gibbs, 155 Ala. 303, 46 So. 465 (1908) as illustrative of this. That case arose from an alleged breach of contract to deliver goods to Alabama. The contract called for shipment from New York to Alabama and contained a clause which limited the carrier's liability to a maximum of $50. That provision was valid under the laws of the State of New York but invalid as against the public policy of the State of Alabama. This court held *1168 the validity of the clause was to be determined under Alabama law in light of the fact that performance of the contract, delivery of the goods, was to take place in Alabama.
The law of the State of New York, which favors arbitration, is not applicable to this case, because parties cannot stipulate to the application of the law of another jurisdiction where that law is against the public policy of Alabama.

VI.
We conclude that the trial court erred in holding that Alabama law and public policy do not apply in this case. For the reasons stated, the trial court should, forthwith, dissolve the stay granted on 21 June 1982 and allow Alabama Oxygen Company and the Bessemer Development Board to continue prosecution of CV 81-530 in state court. Failing to do so, then upon application of petitioners, the writ of mandamus will issue from this court to compel that action.
WRIT OF MANDAMUS ISSUED CONDITIONALLY.
FAULKNER, ALMON, EMBRY, BEATTY and ADAMS, JJ., concur.
JONES and SHORES, JJ., concur specially.
TORBERT, C.J., and MADDOX, J., dissent.
SHORES, Justice (concurring specially):
I can find nothing to convince me that the Congress has preempted state law in this area. I am convinced to the contrary and find support for this position in the legislative history of the Federal Arbitration Act quoted by Justice Black in his opinion in Prima Paint Corp. v. Flood & Conklin Mfg. Co., supra, and, while his opinion was a dissenting one, his dissent was not on this point, and what he said on this point goes unchallenged by the Supreme Court through Moses H. Cone Memorial Hospital v. Mercury Construction Corp., supra, decided February 23, 1983. I quote Justice Black from Prima Paint:
"[T]here are clear indications in the legislative history that the Act was not intended to make arbitration agreements enforceable in state courts [*]....
"[*] See, e.g., Cohen & Dayton, [The New Federal Arbitration Law, 12 Va.L.Rev. 265 (1926)] at 277; Committee on Commerce, Trade & Commercial Law, [The United States Arbitration Law and Its Application, 11 A.B. A.J. 153] at 155, 156. Mr. Rose, representing the Arbitration Society of America, suggested that the Act might have the beneficial effect of encouraging States to enact similar laws, Joint Hearings [on S. 1005 and H.R. 646 before the Subcommittees of the Committees on the Judiciary, 68th Cong., 1st Sess.], at 28, but Mr. Cohen assured Congress:
"`Nor can it be said that the Congress of the United States, directing its own courts * * *, would infringe upon the provinces or prerogatives of the States. * * * [The] question of the enforcement relates to the law of remedies and not to substantive law. The rule must be changed for the jurisdiction in which the agreement is sought to be enforced * * *. There is no disposition therefore by means of the Federal bludgeon to force an individual State into an unwilling submission to arbitration enforcement.' Id., at 39-40."
87 S.Ct. at 1814.
JONES, J., concurs.
MADDOX, Justice (dissenting).
I respectfully dissent for the following reasons:
(1) The contract involved was one involving interstate commerce and contained an arbitration agreement voluntarily entered into by the parties.
(2) The Federal Arbitration Act (9 U.S.C. § 2 (1976)) creates a federal right to specific enforcement of arbitration agreements which are a part of contracts involving interstate commerce, notwithstanding any state substantive or procedural policies to the contrary.

I
By its terms, the Federal Arbitration Act makes "valid, irrevocable, and enforceable" any written arbitration provision in a "maritime transaction or a contract evidencing a *1169 transaction involving commerce." 9 U.S.C. § 2 (1976).[1]
The stay provision in 9 U.S.C. § 3[2] has been held to apply to the two kinds of contracts specified in §§ 1[3] and 2 of the Act. Bernhardt v. Polygraphic Co., 350 U.S. 198, 201, 76 S.Ct. 273, 275, 100 L.Ed. 199 (1956); Prima Paint v. Flood and Conklin Mfg. Co., 388 U.S. 395, 401, 87 S.Ct. 1801, 1804, 18 L.Ed.2d 1270 (1967). The contract in the case at bar providing for the sale of the refrigeration system is, as the trial court found, one involving interstate commerce, thus meeting the Act's test of applicability. The Act's legislative history reflects the apparent desire by Congress to enact a measure to quell longstanding judicial and legislative enmity to executory arbitration agreements. The Senate Judiciary Committee reported:
"But it is very old law that the performance of a written agreement to arbitrate would not be enforced in equity, and that if an action at law were brought on the contract containing the agreement to arbitrate, such agreement could not be pleaded in bar of the action; nor would such an agreement be ground for a stay of proceedings until arbitration was had. Further, the agreement was subject to revocation by either of the parties at any time before the award. With this as the state of the law, such agreements were in large part ineffectual, and the party aggrieved by the refusal of the other party to carry out the arbitration agreement was without adequate remedy.
"Until recently in England, and up to the present time in nearly, if not quite all, the States of the Union, such has been the law in regard to arbitration agreements. The Federal courts have in the main been governed by the same rules and, as a consequence, have denied relief to the parties seeking to compel the performance of executory agreements to settle and determine disputes by arbitration. If the agreement to arbitrate is found in a maritime contract or transaction, no action in admiralty for specific performance will lie, for the simple reason that this court is without power to grant equitable relief.
"Various reasons have been given for these ancient rules of English law, followed as they have been by our State and Federal courts. Among these reasons were, first, the expressed fear on the part of the courts that arbitration tribunals did not possess the means to give full or proper redress, and also the doubt they entertained as to their right to compel an unwilling party to submit his cause to *1170 such a tribunal, thus, denying to him the right to submit the same to the ordinary courts of justice for hearing and determination. Second, the jealousy of their rights as courts, coupled with the fear that if arbitration agreements were to prevail and be enforced, the courts would be ousted of much of their jurisdiction. To what extent the second reason influenced the first may be difficult to say; but it is not unreasonable to suppose that a desire to retain, if not extend, their jurisdiction had much to do with inspiring the fear that arbitration tribunals could not do justice between the parties. And third, established precedent has had its large part of course in perpetuating the old rules long after the courts themselves could no longer see that they were founded in reason or justice."
S.Rep. No. 536, 68th Cong., 1st Sess. 2-3 (1924).
The following portion of the House Judiciary Committee report on the arbitration bill is equally instructive:
"The matter is properly the subject of Federal action. Whether an agreement for arbitration shall be enforced or not is a question of procedure to be determined by the law court in which the proceeding is brought and not one of substantive law to be determined by the law of the forum in which the contract is made. Before such contracts could be enforced in the Federal courts, therefore, this law is essential. The bill declares that such agreements shall be recognized and enforced by the courts of the United States. The remedy is founded also upon the Federal control over interstate commerce and over admiralty. The control over interstate commerce reaches not only the actual physical interstate shipment of goods but also contracts relating to interstate commerce.
"Arbitration agreements are purely matters of contract, and the effect of the bill is simply to make the contracting party live up to his agreement. He can no longer refuse to perform his contract when it becomes disadvantageous to him. An arbitration agreement is placed upon the same footing as other contracts, where it belongs."
H.R.Rep. No. 96, 68th Cong., 1st Sess. 1 (1924). As a consequence, the Act, which was enacted in 1925, creates a federal right to specific enforcement of arbitration agreements which are a part of contracts involving interstate commerce. See 9 U.S.C. § 4[4] (1976); see generally Annot., 95 *1171 A.L.R.3d 1145 (1979). I am of the opinion this includes the contract here.
The Supreme Court of the United States in Moses H. Cone Mem. Hospital v. Mercury Const. Corp., ___ U.S. ___, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), discussed the applicability of arbitration clauses in contracts involving interstate commerce.
There, Mercury, whose principal place of business is in Alabama, and the hospital, which is located in North Carolina, entered into a contract for the construction of additions to the hospital building. The contract, drafted by representatives of the hospital, included a broad arbitration clause which provided that any dispute decided by the project architect in the first instance could be submitted by either party to binding arbitration.
While there are several other issues which the Court addresses in the opinion relative to the particular facts of that controversy, the following language relates entirely to the issue before this Court in this case:
"The basic issue presented in Mercury's federal suit was the arbitrability of the dispute between Mercury and the Hospital. Federal law in the terms of the Arbitration Act governs that issue in either state or federal court. Section 2 is the primary substantive provision of the Act, declaring that a written agreement to arbitrate `in any maritime transaction or a contract evidencing a transaction involving commerce ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.' 9 U.S.C. § 2. Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act. In Prima Paint Corp. v. Flood & Conklin Mfg. Corp., 388 U.S. 395 [87 S.Ct. 1801, 18 L.Ed.2d 1270] (1967), for example, the parties had signed a contract containing an arbitration clause, but one party alleged that there had been fraud in the inducement of the entire contract (although the alleged fraud did not go to the arbitration clause in particular). The issue before us was whether the issue of fraud in the inducement was itself an arbitrable controversy. We held that the language and policies of the Act required the conclusion that the fraud issue was arbitrable. Id., at 402-404 [87 S.Ct. at 1805-1806]. Although our holding in Prima Paint extended only to the specific issue presented, the courts of appeals have since consistently concluded that questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration. We agree. The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." (Footnotes omitted.) (Emphasis supplied.)
Moses H. Cone Mem. Hospital, supra.
I am of the opinion that the Supreme Court of the United States has stated the applicable law concerning the enforceability of executory agreements to arbitrate. Moreover, the Supreme Court discussed the question of a state court's stay of a court action pending arbitration pursuant to § 3 of the Arbitration Act, which is precisely what the circuit court did in the present case:
"Finally, in this case an important reason against allowing a stay is the probable inadequacy of the state-court proceeding to protect Mercury's rights. We are not to be understood to impeach the competence or procedures of the North Carolina courts. Moreover, state courts, as much as federal courts, are obliged to grant stays of litigation under § 3 of the Arbitration Act. It is less clear, however, whether the same is true of an order to compel arbitration under § 4 of the Act. *1172 We need not resolve that question here; it suffices to say that there was, at a minimum, substantial room for doubt that Mercury could obtain from the state court an order compelling the Hospital to arbitrate. In many cases, no doubt, a § 3 stay is quite adequate to protect the right to arbitration. But in a case such as this, where the party opposing arbitration is the one from whom payment or performance is sought, a stay of litigation alone is not enough. It leaves the recalcitrant party free to sit and do nothingneither to litigate nor to arbitrate. If the state court stayed litigation pending arbitration but declined to compel the Hospital to arbitrate, Mercury would have no sure way to proceed with its claims except to return to federal court to obtain a § 4 ordera pointless and wasteful burden on the supposedly summary and speedy procedures prescribed by the Arbitration Act." (Emphasis added.)
Moses H. Cone Mem. Hospital, supra.
The majority states that the existence of a state policy against the specific enforcement of agreements to arbitrate future disputes renders this type of agreement unenforceable, citing Wells v. Mobile County Board of Realtors, 387 So.2d 140 (1980), as authority.
Wells, supra, involved an arbitration clause in a contract involving intrastate commerce, not interstate commerce as is the case here. I would point out that the enforcement of arbitration clauses in any contract, whether involving intrastate or interstate commerce is not, in my opinion, clearly forbidden. In Headley v. Aetna Ins. Co., 202 Ala. 384, 385, 80 So. 466 (1918), which was cited in Wells, the following statement was made by the Court:
"An arbitration clause, induced by fraud, folly, or undue pressure, might well be refused a specific performance, or disregarded, when set up as a defense; but when parties stand upon equal footing, and provide such a mode for the adjustment of their differences, it is not easy to assign a reason why such contracts should not stand." (Emphasis added.)
202 Ala. at 385, 80 So. at 467.
The enforceability of such agreements in commercial contracts would seem to be permitted by current law and would not violate this state's public policy. On the public policy question, this Court has held:
"The true test to determine whether a contract is unenforceable because of public policy is whether the public interest is injuriously affected in such substantial manner that private rights and interests should yield to those of the public."
Colston v. Gulf States Paper Corp., 291 Ala. 423, 427, 282 So.2d 251, 255 (1973).
Since this Court has stated in the past that a promisor should be held strictly to the literal terms of his promise, Alpine Const. Co. v. Water Works Board of the City of Birmingham, 377 So.2d 954 (1979), and it is clear that in this contract, which involves interstate commerce, the parties had the power to exclude the federal act by omitting any provision for arbitration, I see no reason why the provisions of the federal act should not be complied with, as the trial court held.

II
The holding of the Court expresses a minority view in this area of law. Many of the federal and state courts which have addressed this issue have held such arbitration agreements enforceable. In the leading case of Robert Lawrence Co. v. Devonshire Fabrics, Inc., 271 F.2d 402 (2d Cir.1959), cert. granted, 362 U.S. 909, 80 S.Ct. 682, 4 L.Ed.2d 618, cert. dismissed, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960), a direction was made to stay court proceedings pending arbitration pursuant to the Federal Arbitration Act. The following language of the opinion is instructive:
"Thus we think the text of the Act and the legislative history demonstrate that the Congress based the Arbitration Act in part on its undisputed substantive powers over commerce and maritime matters. To be sure much of the Act is purely procedural in character and is intended to *1173 be applicable only in the federal courts. But Section 2 declaring that arbitration agreements affecting commerce or maritime affairs are `valid, irrevocable, and enforceable' goes beyond this point and must mean that arbitration agreements of this character, previously held by state law to be invalid, revocable or unenforceable are now made `valid, irrevocable, and enforceable.' This is a declaration of national law equally applicable in state or federal courts.... This conclusion flows directly from the realization by the Congress that nothing of significance would have been accomplished without tapping these substantive sources of power. It is these that put teeth into the statute and make it accomplish the salutary and beneficial ends the Congress had in mind. It matters not that in the interval of years since the passage of the Act this point has only rarely been noticed.... What does matter is whether or not this reasoning is sound. And we believe it to be sound if the Congress intended to use to the fullest possible extent its powers to regulate commerce as it was affected by arbitration agreements and to do the same thing in the field of maritime law." (Emphasis added.)
271 F.2d at 407.
Other federal courts of appeals have similarly ruled that § 2 of the Act is pre-emptive of conflicting state laws which restrict the enforceability of arbitration agreements. See e.g., American Airlines, Inc. v. Louisville & Jefferson County Air Board, 269 F.2d 811, 815 (6th Cir.1959); Collins Radio Co. v. Ex-Cell-O Corp., 467 F.2d 995, 998 (8th Cir.1972); Supak & Sons Manufacturing Co., Inc. v. Pervel Industries, Inc., 593 F.2d 135, 137 (4th Cir.1979). See also Zell v. Jacoby-Bender, Inc., 542 F.2d 34 (7th Cir.1976). Cf. Ross v. Twentieth Century-Fox Film Corp., 236 F.2d 632 (9th Cir.1956) (The Federal Arbitration Act applied since there was an interstate commerce transaction, but California law applied as to whether the contract included an enforceable agreement to arbitrate, or merely included language too informal to be deemed a binding arbitration provision).
The Fifth Circuit Court of Appeals, prior to its division and the creation of the new Eleventh Circuit Court of Appeals, also enforced agreements to arbitrate pursuant to the requirements of the federal act. In Commercial Metals Co. v. Balfour, Guthrie, and Co., Ltd., 577 F.2d 264 (5th Cir.1978), the Circuit Court held:
"It must be emphasized that the question of whether or not a dispute arising out of a contract will be subject to the arbitration process is left solely to the agreement of the parties to the contract. If the contract does not so provide, then no federal law requires arbitration. If the agreement does provide for arbitration, then Section 2 of the Act removes the previous impediments to enforcement of the clause."
". . .
"It is clear that the state courts are entirely able, as well as required, to apply the United States Arbitration Act and compel arbitration pursuant to the Act if the statutory requisites are present...."
577 F.2d at 266 and 269. See Southeastern Enameling Corp. v. General Bronze Corp., 434 F.2d 330 (5th Cir.1970); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu, 637 F.2d 391 (5th Cir.1981). See also Blount Brothers Corp. v. M.K. Steel, Inc., 524 F.Supp. 1037 (N.D.Ala.1981).
The majority rule in other state jurisdictions is that the Federal Arbitration Act controls the enforceability of arbitration clauses in contracts being litigated in state court. Annot., 95 A.L.R.3d 114 at 1158 (1979). State courts relying on the proposition that the Federal Arbitration Act is based on Congress's power to control interstate commerce and admiralty have uniformly held that the supremacy clause, U.S. Const. art. VI, cl. 2, irrespective of state law, controls actions brought in state court to enforce voluntary arbitration agreements in contracts evidencing transactions in interstate commerce. The Supreme Court of the State of Tennessee recently ruled:
"... The supremacy clause resolves any inconsistency between the two laws *1174 [state and federal] in favor of the federally created right and subordinates Tennessee state law to the supreme law of the land. We, therefore, hold that Tennessee courts must recognize and apply the Federal Arbitration Act to interstate commerce contracts."
Tennessee River Pulp & Paper Co. v. Eichleay Corp., 637 S.W.2d 853, 858 (Tenn.1982).
The federal act was applied by the Supreme Court of the State of Georgia in West Point-Pepperell, Inc. v. Multi-Line Industries, Inc., 231 Ga. 329, 201 S.E.2d 452 (1973). In reversing a judgment restraining the seller from further attempts to compel arbitration in New York, as required by the written agreement between the parties, the Georgia court stated that since the transaction involved commerce within the meaning of the Federal Arbitration Act, the state law and policy with respect to arbitration must yield to paramount federal law. West-Point Pepperell, supra, 231 Ga. at 331, 201 S.E.2d at 453.
The former Kentucky rule that executory arbitration agreements were unenforceable was held inapplicable in Fite & Warmath Const. Co., Inc. v. MYS Corp., 559 S.W.2d 729 (Ky.1977). The Supreme Court of Kentucky, in staying a state court proceeding pending arbitration, ruled:
"... We, therefore, hold that the provisions of the U.S. Arbitration Act of 1925 apply to actions brought in the courts of this state where the purpose of the action is to enforce voluntary arbitration agreements in contracts evidencing transactions in interstate commerce.
". . .
"The effect of our decision makes enforceable a contract to arbitrate a future dispute where applicable federal law so provides. We do not consider, however, that we are displacing a viable public policy of this state.... The device of arbitration has been specifically approved by our State Constitution since 1799. Our case law has stated that it is the policy to favor the settlement of disputes by means of arbitration. The legislature has adopted an arbitration statute, Chapter 417 of the Kentucky Revised Statutes. This Act empowers the parties to voluntarily submit an existing dispute to the process of arbitration. The spectre remains, however, of the applicability of the common-law rule which as a matter of judge-made law prohibits the enforceability of agreements to arbitrate future disputes based on the questionable justification that such agreements `oust the courts of jurisdiction.' This rationale has not escaped without serious criticism....."
". . .
"We are not concerned here with an adhesion contract or one where the bargaining power of the parties is disparate. We deal rather with an agreement voluntarily entered into by sophisticated and knowledgeable businessmen concerning a financial transaction of considerable magnitude. In such situation, we find no real support for the proposition that one of the parties is free to repudiate his promise. We are convinced that the application of federal law in this instance does not displace a fundamental public policy of this state."
559 S.W.2d at 734, 735. Accord Rederi v. Dow Chemical Co., 25 N.Y. 576, 307 N.Y.S.2d 660, 255 N.E.2d 774 (1970) cert. denied 398 U.S. 939, 90 S.Ct. 1844, 26 L.Ed.2d 272 (1970); Episcopal Housing Corp. v. Federal Insurance Co., 269 S.C. 631, 239 S.E.2d 647 (1977); Burke County Pub. Schools Bd. of Ed. v. Shaver Partnership, 303 N.C. 408, 279 S.E.2d 816 (1981); Mamlin v. Susan Thomas, Inc., 490 S.W.2d 634 (Tex.Civ.App.1973); Pinkis v. Network Cinema Corp. 9 Wash. App. 337, 512 P.2d 751 (1973); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Melamed, 405 So.2d 790 (Fla.Dist.Ct.App.1981); State ex rel. St. Joseph Light & Power Co. v. Donelson, 631 S.W.2d 887 (Mo.Ct.App. 1982). But see Pullman, Inc. v. Phoenix Steel Corp., 304 A.2d 334 (Del.1973).
I am mindful of the rights of litigants to their day in court, but I am equally mindful of the intent of Congress to uphold voluntary arbitration clauses in contracts such as *1175 the one involved here. "Federal law in the terms of the Arbitration Act governs that issue in either state or federal court." Moses H. Cone Mem. Hospital, supra. The plurality, in refusing to follow this principle of law announced in Moses H. Cone Mem. Hospital, states that "there seems to have been no consideration whether there is a strong federal interest in favor of commercial arbitration over litigation in state courts," and "that both the state and federal interest in preserving state contract law in this area outweighs federal interest in favor of arbitration," and misreads the Moses H. Cone Mem. Hospital case, in my opinion. In fact, by reaching the conclusion it does, the plurality places emphasis upon a statement made in Justice Black's dissent in Prima Paint that "there are clear indications in the legislative history that the Act was not intended to make arbitration agreements enforceable in state courts...."
In the first place, Justice Black's views were expressed in a dissenting opinion, and in Moses H. Cone Mem. Hospital, supra, the Supreme Court stated that the refusal of the federal district court to proceed because a state court suit was pending, "was plainly erroneous in view of Congress's clear intent, in the Arbitration Act, to move the parties to an arbitrable dispute "out of court and into arbitration as quickly and easily as possible." (Emphasis added.) In Moses H. Cone Mem. Hospital, supra, the Supreme Court stated that "... state courts, as much as federal courts, are obliged to grant stays of litigation under § 3 of the Arbitration Act." (Emphasis added.) ___ U.S. ___, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). In footnote 34, which follows this statement in the Moses H. Cone Mem. Hospital opinion, the Supreme Court noted:
"Although § 3 refers ambiguously to a suit `in any of the courts of the United States,' the state courts have almost unanimously recognized that the stay provision of § 3 applies to suits in state as well as federal courts, requiring them to issue the same speedy relief when a dispute is referrable to arbitration. (The North Carolina Supreme Court has so held, although not until after the District Court ordered this stay. Burke County Public Schools Board of Education v. Shaver Partnership, 303 N.C. 408, 279 S.E.2d 816 (1981).) This is necessary to carry out Congress's intent to mandate enforcement of all covered arbitration agreements; Congress can hardly have meant that an agreement to arbitrate can be enforced against a party who attempts to litigate an arbitrable dispute in federal court, but not against one who sues on the same dispute in state court. See also Prima Paint, 388 U.S. at 404 [87 S.Ct. at 1806]." (Emphasis added.)
___ U.S. ___, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).
In Burke County Pub. Schools Bd. of Ed. v. Shaver Partnership, 303 N.C. 408, 279 S.E.2d 816 (1981), as noted by the United States Supreme Court in its opinion, the Supreme Court of North Carolina explained that the application of the Federal Arbitration Act by state courts furthers the congressional intent of making available to the business community the benefits of arbitration, which eases the burden of crowded court dockets, and promotes uniformity where parties have agreed to arbitrate, thus discouraging "forum shopping." 279 S.E.2d at 824. The Burke case was favorably noted by the Supreme Court of the United States in Moses H. Cone Mem. Hospital, supra.
Even assuming state courts were not "obliged to grant stays of litigation under § 3 of the Arbitration Act," as the Supreme Court states in Moses H. Cone Mem. Hospital, I believe this Court should follow the almost unanimous holdings by other state courts that the Federal Arbitration Act is applicable to contracts like that sued upon here. With the cases being filed at the various levels of our state's judicial system proliferating each year, arbitration is a means of helping to ameliorate the overcrowding of our courts and the costly expense of litigation. Not surprisingly, the Uniform Arbitration Act, which was introduced by the Conference of Commissioners on Uniform State Laws in 1955 and which *1176 parallels the Federal Arbitration Act in many respects, has been adopted in whole or in part in forty jurisdictions,[5] as a means of easing the tremendous strain on their state courts.
In his concurrence in Bernhardt v. Polygraphic Co., 350 U.S. 198, 205, 76 S.Ct. 273, 277, 100 L.Ed. 199 (1956), Justice Frankfurter auspiciously noted that "[l]aw does change with times and not merely through legislative reforms." 350 U.S. at 209, 76 S.Ct. at 279-280. Regarding the influence of legislative enactments from other jurisdictions, Justice Frankfurter, quoting from National City Bank of New York v. Republic of China, 348 U.S. 356, 360, 75 S.Ct. 423, 427, 99 L.Ed. 389 (1955), further noted that: "A steady legislative trend, presumably manifesting a strong social policy, properly makes demands on the judicial process." 350 U.S. at 211, 76 S.Ct. at 281. I am of the opinion that the Supreme Court in Moses H. Cone Mem. Hospital was clearly aware of the development of the law concerning state court enforcement of the Federal Arbitration Act and has clearly held that the Federal Arbitration Act controls the enforcement of arbitration clauses in contracts which fall within the scope of the federal act. I, therefore, would deny petitioners' request for a writ of mandamus and affirm the trial court's stay order pursuant to 9 U.S.C. § 3, pending arbitration of the contract dispute in this case.
TORBERT, C.J., concurs.
NOTES
[1] See McEntire v. Monarch Feed Mills, 276 Ark. 1, 631 S.W.2d 307 (Ark.1982); Keating v. Superior Court of Alameda County, 31 Cal.3d 584, 183 Cal.Rptr. 360, 645 P.2d 1192 (Cal. 1982); Hecla Min. Co. v. Bunker Hill Co., 101 Idaho 557, 617 P.2d 861 (Idaho 1981); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Melamed, 405 So.2d 790 (Fla.Dist.Ct.1981); Payne Webber v. McNeal, 143 Ga.App. 579, 239 S.E.2d 401 (Ga.App.1977); Pathman Constr. Co. v. Knox County Hospital Ass'n, 164 Ind. App. 121, 326 N.E.2d 844 (Ind.App.1975); R.J. Palmer Constr. Co. v. Wichita Band Inst. Co., 7 Kan.App.2d 363, 642 P.2d 127 (Kan.App.1982); Fite & Warmath Constr. Co. v. M.Y.S. Corp., 559 S.W.2d 729 (Ky.1977); Thayer v. American Finan. Advisors, Inc., 322 N.W.2d 599 (Minn. 1982); State ex rel. St. Joseph Light and Power Co. v. Donelson, 631 S.W.2d 887 (Mo.App. 1982); Sentry Systems, Inc. v. Guy, 654 P.2d 1008 (Nev.1982); J. Ludwig Mowinkels Rederi v. Dow Chemical Co., 25 N.Y.2d 576, 307 N.Y. S.2d 660, 255 N.E.2d 774 (N.Y.1970), cert. den. 398 U.S. 939, 90 S.Ct. 1844, 26 L.Ed.2d 272 (1971); Burke County Pub. Schools Bd. of Ed. v. Shaver Partnership, 303 N.C. 408, 279 S.E.2d 816 (N.C.1981); Litton R.C.S., Inc. v. Penn Turnpike Comm., 376 F.Supp. 579 (D.C.Pa. 1974); Episcopal Housing Corp. v. Fed. Ins. Co., 269 S.C. 631, 239 S.E.2d 647 (S.C.1977); Tenn. River Pulp and Paper Co. v. Eichleay Corp., 637 S.W.2d 853 (Tenn.1982); Withers-Busby Group v. Surety Industries, 538 S.W.2d 853 (Tenn.1982); R.E. Bean Constr. Co. v. Middlebury Associates, 428 A.2d 306 (Vt.1980); and Pinkis v. Network Cinema Corp., 9 Wash. App. 337, 512 P.2d 751 (Wash.App.1973). Other states have held the Federal Act inapplicable; see Pullman, Inc. v. Phoenix Steel Corp., 304 A.2d 334 (Del.Sup.Ct.1973); Kress Corp. v. Edw. C. Levy Co., 102 Ill.App.3d 264, 58 Ill.Dec. 561, 430 N.E.2d 593 (Ill.App.1981).
[2] See Ala.Code § 6-6-1, et seq. (1975); Alaska Stat. §§ 09.43.010, et seq. (1973); Ariz.Rev. Stat.Ann. §§ 12-1501, et seq. (1982); Ark.Stat. Ann. §§ 34-511, et seq. (1962); Cal.Civ.Proc. Code §§ 1280, et seq. (West 1982); Colo.Rev. Stat. §§ 13-22-201, et seq. (1960); Conn.Gen. Stat. §§ 52-408, et seq. (1960); 10 Del.Code Ann. §§ 5701, et seq. (1974); D.C.Code Ann. §§ 16-4301, et seq. (1981); Fla.Stat. §§ 682.01, et seq. (1980); Ga.Code §§ 7-101, et seq. (1981); Haw.Rev.Stat. §§ 658-1, et seq. (1976); Idaho Code §§ 7-901, et seq. (1979); Ill.Rev. Stat. ch. 10 §§ 101, et seq. (1975); Ind.Code §§ 34-4-2-1, et seq. (1973); Iowa Code §§ 679.1, et seq. (1950); Kan.Stat.Ann. §§ 5-401, et seq. (1982). Ky.Rev.Stat.Ann. §§ 417.010, et seq. (1981); La.Rev.Stat.Ann. §§ 9:4201, et seq. (1951); 14 Maine Rev.Stat. Ann. §§ 5927, et seq. (1964); Md.Cts. & Jud. Proc. 3-201, et seq. (1974); Mass.Gen.Laws Ann. ch. 251 §§ 1, et seq. (1980); Mich.Stat. Ann. §§ 600.5001, et seq. (1968); Minn.Stat. §§ 572.08, et seq. (1947) Miss.Code Ann. §§ 11-15-1, et seq. (1972); Mo.Ann.Stat. §§ 435.350, et seq. (Vernon, 1982); Mont.Code Ann. §§ 27-5-101, et seq. (1981); Neb.Rev. Stat. §§ 25-2103, et seq. (1943). N.H.Rev.Stat. Ann. §§ 541:1, et seq. (1974); Nev.Rev.Stat. §§ 38.015, et seq. (1969); N.J.Rev.Stat. §§ 2A:24-1, et seq. (1952); N.M.Stat.Ann. §§ 44-7-1, et seq. (1978); N.Y.Civ.Prac.Law §§ 7501, et seq. (McKinney 1980); N.C.Gen. Stat. §§ 1-567.1 et seq. (1969); N.D.Cent.Code §§ 32-29-01, et seq. (1976); Ohio Rev.Code Ann. §§ 2711.01, et seq. (1982); 15 Okla.Stat. Ann. §§ 801, et seq. (1960); Or.Rev.Stat. §§ 33.210, et seq. (1981); 231 Pa.Code §§ 1301, et seq. (1981); S.C.Code Ann. §§ 15-18-10, et seq. (1976); S.D.Codified Laws Ann. §§ 21-25A-1 et seq. (1979); Tenn.Code Ann. §§ 29-5-101, et seq. (1980); Tex.Code Ann. 224, et seq. (Vernon 1973); Utah Code Ann. §§ 78-31-1, et seq. (1953); Va.Code §§ 801-577, et seq. (1977); Wash.Rev.Code §§ 704.010, et seq. (1981); W.Va.Code §§ 55-10-1, et seq. (1981); Wis.Stat.Ann. §§ 788.01, et seq. (1981); Wyo. Stat. §§ 1-36-101, et seq. (1977).
[3] "The court cited two commercial arbitration cases, neither of which supports the proposition that a federal policy favors arbitration over litigation to ease the congestion of the courts. The citation to Shanferoke Coal & Supply Corp. v. Westchester Serv. Corp., 293 U.S. 449, 453 [55 S.Ct. 313, 315, 79 L.Ed. 583] (1935), was apparently to the Court's reference to `congressional approval of arbitration.' It is difficult to see how the Robert Lawrence court stretched this to support the proposition that Congress favors arbitration independently of the intent of the parties. The citation to Kulukundis Shipping Co., S/A v. Amtorg Trading Corp., 126 F.2d 978 (2d Cir.1942), was apparently to that court's quotation from the report of the House Committee that referred to the `agitation against the costliness and delays of litigation.' H.R.Rep. No. 96, 68th Cong. 1st Sess. (1924), cited in 126 F.2d at 985. However, this `agitation' came from businessmen whose expectations about arbitration agreements were being undermined by the courts. Congress never mentioned any need to reduce the case loads of the federal courts. Courts following Robert Lawrence have cited Robert Lawrence itself as the source of this policy. See, e.g., Southwest Indus. Import & Export, Inc. v. Wilmod Co., 524 F.2d 468, 470 (5th Cir.1975). For an argument that there is a pro-arbitration policy, see Note, supra note 17, at 603-04 n. 68." Note, Federal Arbitration Act, 78 Mich.L.Rev. 1391 (1980).
[1] Section 2 reads:

"A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, of any agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."
[2] Section 3 reads:

"If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration."
[3] Section 1 reads:

"`Maritime transactions', as herein defined, means charter parties, bills of lading of water carriers, agreements relating to wharfage, supplies furnished vessels or repairs to vessels, collisions, or any other matters in foreign commerce which, if the subject of controversy, would be embraced within admiralty jurisdiction; `commerce', as herein defined, means commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation, but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."
[4] Section 4 reads:

"A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28 in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. Five days' notice in writing of such application shall be served upon the party in default. Service thereof shall be made in the manner provided by the Federal Rules of Civil Procedure. The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure or may specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof."
[5] American Arbitration Association Annual Report of 1980. Only Alabama, Iowa, Kentucky, Mississippi, Montana, Nebraska, North Dakota, Tennessee, Vermont and West Virginia have not adopted this uniform act.